[No. S166435. July 12, 2010.]

JAMES CLAYWORTH et al., Plaintiffs and Appellants, v. PFIZER, INC., et al., Defendants and Respondents.

760

COUNSEL

Alioto Law Firm, Joseph M. Alioto, Joseph M. Alioto, Jr., Theresa D. Moore, Angelina Alioto-Grace, Thomas P. Pier; Law Offices of John H. Boone, John H. Boone; Foreman & Brasso, Russell F. Brasso; Law Offices of James M. Dombroski, James M. Dombroski; Law Offices of Jeffrey K. Perkins, Jeffrey K. Perkins; Gary D. McCallister & Associates, Gary D. McCallister, Thomas A. Kelliher, Eric I. Unrein and Jaime Goldstein for Plaintiffs and Appellants.

Coughlin Stoia Geller Rudman & Robbins, Pamela M. Parker; Schubert Jonckheer Kolbe & Kralowec and Kimberly A. Kralowec for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Zelle Hofmann Voelbel & Mason, Craig C. Corbitt and Henry A. Cirillo for Pharmacists Planning Service, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Filice Brown Eassa & McLeod, Peter A. Strotz, Paul R. Johnson, William E. Steimle; Davis Polk & Wardwell, Ameila Starr, Arthur F. Golden, William J. Fenrich and Daniel J. Schwartz for Defendant and Respondent AstraZeneca LP.

Winston & Strawn, Tyler M. Paetkau, Nicole P. Dogwill, James F. Hurst, Susan A. Pipal, Matthew J. Sullivan; Eimer Stahl Klevorn & Solberg, David M. Stahl, J. Cunyon Gordon and Adam Oyenbanji for Defendant and Respondent Abbott Laboratories.

Gibson, Dunn & Crutcher, Jeffrey T. Thomas and James N. Knight for Defendant and Respondent Allergan, Inc.

Mayer, Brown, Rowe & Maw, Mayer Brown, Donald M. Falk, John Nadolenco, Mack Anderson; Sheppard Mullin Richter & Hampton, Steven O. Kramer, John P. Stigi III; Hogan & Hartson and Joseph H. Young for Defendant and Respondent Amgen, Inc.

Covington & Burling, Elizabeth Abigail Brown, Anita F. Stork, Theodore Voorhees, Jr., and Thomas J. Cosgrove for Defendant and Respondent Boehringer Ingelheim Pharmaceuticals, Inc.

Sedgwick, Detert, Moran & Arnold, Paul J. Riehle, Matthew A. Fischer; Cravath, Swaine & Moore, Evan R. Chesler, Elizabeth L. Grayer, Jessica Buturla and Jeffrey B. Korn for Defendant and Respondent Bristol-Myers Squibb Company.

Reed Smith, Michele Diane Floyd, Kirsten J. Handelman; Oppenheimer Wolff & Donnelly, Gary Hansen, David Graham and Aaron Mills Scott for Defendant and Respondent Eli Lilly & Company.

Irell & Manella, Alexander F. Wiles, John C. Keith; Cleary Gottlieb Steen & Hamilton, George S. Cary, Sara D. Schotland and David I. Gelfand for Defendant and Respondent GlaxoSmithKline PLC.

Drinker Biddle & Reath, H. Christian L'Orange, Paul H. Saint-Antoine, Mary E. Kohart, David J. Antczak and Joanne C. Lewers for Defendant and Respondent Hoffmann-La Roche Inc.

Folger Levin & Kahn, Crowell & Moring, Beatrice Bich-Dao Nguyen, Samuel Ray Miller, Tracy E. Reichmuth, Cecilia C. Ogbu, Steven E. Wilson; Patterson Belknap Webb & Tyler, William Cavanaugh, Jr., and Cecilia B. Loving for Defendants and Respondents Janssen Pharmaceutical Inc., Johnson & Johnson Health Care Systems, Inc., Ortho Biotech, Inc., and Ortho-McNeil Pharmaceutical, Inc.

Hughes Hubbard & Reed, Rita M. Haeusler, John M. Townsend, Scott H. Christensen, James A. Graffam; Orrick, Herrington & Sutcliffe, Robert P. Reznick and David Goldstein for Defendant and Respondent Merck Sharp & Dohme Corp. formerly known as Merck & Co., Inc.

Kaye Scholer, Aton Arbisser, Bryant S. Delgadillo, Saul P. Morgenstern, Karin E. Garvey; Faegre & Benson, James A. O'Neal and Kim J. Walker for Defendant and Respondent Novartis Pharmaceuticals Corporation.

Nossaman, Gunther, Knox & Elliott, Nossaman, Scott DeVries, Katrina June Lee; Dickstein Shapiro, Peter J. Kadzik, Bernard Nash, Maria Colsey Heard, Milton Marquis and Andres Colin for Defendant and Respondent Pfizer Inc.

Latham & Watkins, Charles H. Samel, Jennifer A. Carmassi, Margaret M. Zwisler, Steven H. Schulman and Belinda S. Lee for Defendant and Respondent Pharmaceutical Research and Manufacturers of America.

Arnold & Porter, Ronald C. Redcay, Douglas L. Wald, Mark R. Merley, Daniel R. Waldman, Anne P. Davis and Ryan Z. Watts for Defendant and Respondent Wyeth.

## OPINION

**WERDEGAR, J.**—When a group of companies conspires to fix prices at higher than a competitive level, the resulting overcharge is paid in the first instance by the direct purchaser of the cartel's goods. In markets where the direct purchaser is not also the ultimate purchaser, but an intermediary between the cartel and the consumer (the indirect purchaser), several questions arise: First, who should be permitted to sue for price fixing, the direct purchaser, the indirect purchaser, or both? Second, how should damages be allocated? Should an antitrust conspirator be permitted to raise as a defense that the direct purchaser passed on some or all of the overcharge to indirect purchasers downstream in the chain of distribution?

Under federal antitrust law, the answer to these questions is settled. In *Hanover Shoe v. United Shoe Mach.* (1968) 392 U.S. 481 [20 L.Ed.2d 1231, 88 S.Ct. 2224] (*Hanover Shoe*), the United States Supreme Court held antitrust violators ordinarily could not assert as a defense that any illegal overcharges had been passed on by a plaintiff direct purchaser to indirect purchasers. Instead, the full measure of the overcharge is recoverable by the direct purchaser. In a related decision nine years later, the Supreme Court concluded only direct purchasers, not indirect purchasers, could sue for price fixing. (*Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720 [52 L.Ed.2d 707, 97 S.Ct. 2061] (*Illinois Brick*).)

Under state antitrust law, only the first question—who may sue—is settled. In 1978, in direct response to *Illinois Brick*, the Legislature amended the state's Cartwright Act (Bus. & Prof. Code, § 16700 et seq.)[1] to provide that unlike federal law, state law permits indirect purchasers as well as direct purchasers to sue (§ 16750, subd. (a)). This left open the further question how damages should be allocated. Does the Cartwright Act permit a pass-on defense, or in this respect are state and federal law the same?

We conclude that under the Cartwright Act, as under federal law, generally no pass-on defense is permitted. While the text of the Cartwright Act does not answer the question, the Legislature's actions in response to *Illinois Brick* and related federal statutory amendments reveal a clear legislative preference for the *Hanover Shoe* rule. As well, that rule is the one most closely in accord

---

[1] All further unlabeled statutory references are to the Business and Professions Code.

with the Legislature's overarching goals of maximizing effective deterrence of antitrust violations, enforcing the state's antitrust laws against those violations that do occur, and ensuring disgorgement of any ill-gotten proceeds. Accordingly, we reverse the Court of Appeal, which held that a pass-on defense was available and that it entitled the alleged price-fixing defendants here to summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On appeal from a grant of summary judgment, we review and recite the evidence in the light most favorable to the nonmoving party (here, plaintiffs). (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Plaintiffs (hereafter Pharmacies) are retail pharmacies located in California.[2] Defendants (hereafter Manufacturers) are, with two exceptions, companies that manufacture, market, and/or distribute brand-name pharmaceutical products throughout the United States.[3] Manufacturers also manufacture, market, and/or distribute similar brand-name pharmaceutical products in Canada where, unlike in the United States, the products are subject to government pricing restrictions.

Pharmacies filed suit under section 1 of the Cartwright Act (Stats. 1907, ch. 530, § 1, pp. 984–985, as amended; §§ 16720, 16726) and the unfair competition law (UCL) (§ 17200 et seq.), alleging Manufacturers had unlawfully conspired to fix the prices of their brand-name pharmaceuticals in the United States market, including in California. The complaint alleged

---

[2] Plaintiffs are James Clayworth, R.Ph., an individual, doing business as Clayworth Pharmacy and Clayworth Healthcare; Marin Apothecaries, Inc., doing business as Ross Valley Pharmacy; Golden Gate Pharmacy Services, Inc., doing business as Golden Gate Pharmacy; Pediatric Care Pharmacy, Inc.; Chimes Pharmacy, Inc.; Mark Horne, R.Ph., an individual, doing business as Burton's Pharmacy; Meyers Pharmacy, Inc.; Benson Toy, R.Ph., an individual, doing business as Marin Medical Pharmacy; Seventeen Fifty Medical Center Pharmacy, Inc.; Tony Mavrantonis, R.Ph., an individual, doing business as Jack's Drug; Julian Potashnick, R.Ph., an individual, doing business as Leo's Pharmacies; Jerry Shapiro, R.Ph., an individual, doing business as Uptown Drug, Co.; Tilley Apothecaries, Inc., doing business as Zweber's Apothecary; RP Healthcare, Inc.; Rohnert Park Drugs, Inc.; and JGS Pharmacies, Inc., doing business as Dollar Drugs.

[3] Defendants are Abbott Laboratories; AstraZeneca LP; Novartis Pharmaceuticals Corporation; Allergan, Inc.; Boehringer Ingelheim Pharmaceuticals, Inc.; Eli Lilly & Company; Johnson & Johnson; Janssen Pharmaceutical Inc.; Ortho-McNeil Pharmaceutical, Inc.; Ortho Biotech, Inc.; GlaxoSmithKline PLC; Pfizer, Inc.; Hoffmann-La Roche Inc.; Aventis Pharmaceuticals, Inc.; Amgen, Inc.; Merck & Co., Inc.; Bristol-Myers Squibb Company; Wyeth; Johnson & Johnson Health Care Systems Inc., which apparently does not manufacture, market, or distribute pharmaceutical products; and Pharmaceutical Research and Manufacturers of America, a United States-based nonprofit trade association.

Manufacturers had agreed to set artificially high prices for their products, and had acted in concert to restrain reimportation of their lower priced foreign drugs into the United States and to restrict price competition from generics. As a result, the complaint alleged, Manufacturers were able to maintain prices for their drugs in California, as elsewhere in the United States, at levels 50 to 400 percent higher than for the same drugs sold outside the United States. Pharmacies alleged they consequently had been forced to pay an overcharge, the differential between the conspiracy-inflated prices set by Manufacturers and the prices Pharmacies would have paid in a competitive market. They sought treble damages, restitution, and injunctive relief.

Each Manufacturer answered, denying Pharmacies' allegations and asserting as an affirmative defense that Pharmacies' claims were barred on the ground Pharmacies passed on any alleged overcharge to third parties and therefore did not suffer a compensable injury.

Pharmacies filed a motion for summary adjudication of Manufacturers' pass-on defense, arguing that the defense was unavailable under the Cartwright Act in light of *Hanover Shoe, supra*, 392 U.S. 481, the subsequent legislative history of the Cartwright Act, and public policy. Manufacturers responded with a cross-motion for summary judgment, arguing that under the plain language of the Cartwright Act, a pass-on defense was available and defeated both the Cartwright Act and UCL claims.[4]

Evidence presented in connection with the cross-motions established the following essentially undisputed facts. Manufacturers sell their drugs to wholesalers at a price referred to as the wholesale acquisition cost. In turn, various independent entities use the wholesale acquisition cost to calculate and publish benchmark drug prices, termed the average wholesale price, for use in the industry. Wholesalers resell the drugs to Pharmacies at prices based on a percentage of the average wholesale price. Because the published average wholesale price is a fixed percentage above the price charged by Manufacturers to wholesalers, any price increases by Manufacturers will increase the average wholesale price proportionally. As a result, when Manufacturers increase their prices, the costs of drugs to Pharmacies increase by the same percentage amount.

In turn, Pharmacies sell the drugs to two groups of consumers: (1) those with third party insurance or a drug benefit plan offered by either a private entity or the government, which in turn pays customers' claims on their behalf, and (2) uninsured (or cash-paying) consumers. For the first group,

---

[4] This motion assumed arguendo that Manufacturers had engaged in price fixing. For purposes of this appeal, we do likewise.

those covered by third party payers, Pharmacies are reimbursed at a contractually or statutorily fixed amount, predetermined as a percentage of the average wholesale price, plus a dispensing fee; this reimbursement is greater than Pharmacies' acquisition costs. For the second group, the cash-paying consumers, Pharmacies establish the retail prices unilaterally. Though not required to be, these prices traditionally have been based on a set percentage of the average wholesale price as well, plus in some instances an additional dispensing fee.

Currently, consumers covered by third party payers comprise the bulk of Pharmacies' customers. It appears the percentage of cash-paying consumers has declined over time, with the consequence that the degree of price-setting discretion Pharmacies have has fallen as well.

In light of this evidence, the trial court granted Manufacturers' summary judgment cross-motion and denied as moot Pharmacies' summary adjudication motion. It held a pass-on defense was available under the Cartwright Act: A defendant could reduce or eliminate its liability upon proof that the plaintiff had passed on the alleged price overcharge and thereby limited its damages or suffered no injury. The trial court interpreted the evidence before it as showing that Pharmacies had passed on all of Manufacturers' overcharges to consumers and had thus sustained no damages under the Cartwright Act. The pass-on defense similarly defeated Pharmacies' UCL claim; the trial court concluded Pharmacies lacked standing to pursue the claim because, having recouped the overcharge, they had not "lost money or property," as required under section 17204.

The Court of Appeal affirmed. It rejected the argument that the Legislature had approved application to the Cartwright Act of *Hanover Shoe, supra,* 392 U.S. 481, and its bar against pass-on defenses. Relying instead on its reading of the plain meaning of the Cartwright Act's damages provision (§ 16750, subd. (a)), the Court of Appeal concluded a pass-on defense was available and was fatal to Pharmacies' claims because they could show no "damages sustained" (*ibid.*). It likewise rejected Pharmacies' UCL claims on the grounds that Pharmacies were not entitled to restitution and lacked standing to challenge Manufacturers' alleged unfair business practices.

We granted review to address a significant issue of first impression: whether under the Cartwright Act an antitrust defendant can defeat liability by asserting a pass-on defense. (See *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836, 852, fn. 10 [7 Cal.Rptr.3d 28] ["[T]his issue of the availability of a 'pass-on defense' in antitrust law still remains an open question in California . . . ."]; *J. P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 213, fn. 10 [6 Cal.Rptr.3d 214]

[same]; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1353 [235 Cal.Rptr. 228] [same].)

## DISCUSSION

### I.    Hanover Shoe *and Its Antecedents*

In *Hanover Shoe, supra,* 392 U.S. 481, the United States Supreme Court considered whether the pass-on defense should be available to defendants found to have charged excess prices under federal antitrust law. The United States had obtained a judgment against United Shoe Machinery Corporation (United Shoe) under section 4 of the Sherman Act (15 U.S.C. § 4) for monopolizing the market for shoe manufacturing machinery. Relying on this judgment, shoe manufacturer Hanover Shoe, Inc. (Hanover Shoe), sought to recover the "damages by him sustained" under section 4 of the Clayton Act (15 U.S.C. § 15); United Shoe argued in response that Hanover Shoe had likely incorporated any overcharge it paid United Shoe into the prices it charged its customers for shoes, and accordingly had sustained no damage.

In a seven-to-one decision authored by Justice White, the United States Supreme Court rejected United Shoe's assertion of a pass-on defense.[5] It held that "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4" of the Clayton Act (15 U.S.C. § 15). (*Hanover Shoe, supra,* 392 U.S. at p. 489.)

Explaining this conclusion, the Supreme Court pointed out that however a buyer responds to illegal overcharges, he inevitably will be damaged. First, if the buyer does nothing and absorbs the loss, he suffers lost profits because, while revenue is static, his costs have been increased by the amount of the overcharge. (*Hanover Shoe, supra,* 392 U.S. at p. 489.) Second, "if the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less." (*Ibid.*) Third, "the buyer is equally entitled to damages if he raises the price for his own product." (*Ibid.*) In this last scenario, to the extent the higher price costs the buyer sales, he is injured by his loss of sales; to the extent it does not cost

---

[5] Justice Stewart dissented on the threshold question whether United Shoe had been shown to violate the antitrust laws and accordingly did not reach the issue of how to determine damages. (See *Hanover Shoe, supra,* 392 U.S. at p. 513 (dis. opn. of Stewart, J.).) The seven members of the Supreme Court to consider the pass-on defense thus were unanimous in rejecting it.

him sales, because demand for his product is inelastic, his marginal profit would have been higher had his costs, illegally enhanced, been lower. In sum: "As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." (*Ibid.*)

The Supreme Court offered two additional reasons why acceptance of the pass-on defense would be problematic. First, it would require a fact finder to decide a host of imponderables: whether in the absence of the illegal overcharge the plaintiff would have priced his product differently, what impact such a different price would have had on total sales "in the real economic world rather than an economist's hypothetical model" (*Hanover Shoe, supra,* 392 U.S. at p. 493), and whether the price change might have been pursued anyway even in the absence of the initial overcharge. "Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable." (*Ibid.*) Proof of such factors would depend on massive and complex showings and rebuttals, potentially sidetracking every antitrust trial in a host of issues collateral to the central claim—whether the defendant had engaged in illegal anticompetitive conduct. (*Ibid.*)

Second, broad acceptance of the defense would create a risk that no one would be left with a sufficiently significant injury to be motivated to seek relief; individual end consumers, each harmed to the tune of a few pennies or dollars only, might have insufficient motivation even to pursue a class action. Consequently, "those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them" (*Hanover Shoe, supra,* 392 U.S. at p. 494), and enforcement of the antitrust laws would be compromised.

*Hanover Shoe*'s view of how properly to measure damages was not novel; as Justice White pointed out, a long line of Holmes and Brandeis opinions had adopted the same understanding. (See *Hanover Shoe, supra,* 392 U.S. at pp. 489–490.) Writing for the court in *Chattanooga Foundry v. Atlanta* (1906) 203 U.S. 390 [51 L.Ed. 241, 27 S.Ct. 65], Justice Holmes explained why a pass-on defense was inconsistent with the law's general take on damages: "A man is injured in his property when his property is diminished. . . . [W]hen a man is made poorer by an extravagant bill we do not regard his wealth as a unity, or the tort, if there is one, as directed against that unity as an object. We do not go behind the person of the sufferer. We say that he has been defrauded or subjected to duress, or whatever it may be, and stop there." (*Id.* at p. 399.) Several years later, he explained again why a pass-on defense

should not stand as a bar to allegations of excessive rate charges under federal transportation law: "The only question before us is . . . whether the fact that the plaintiffs were able to pass on the damage . . . prevents their recovering the overpayment . . . . The answer is not difficult. The general tendency of the law, in regard to damages at least, is not to go beyond the first step. . . . The plaintiffs suffered losses . . . when they paid. Their claim accrued at once in the theory of the law and it does not inquire into later events." (*Southern Pac. Co. v. Darnell-Taenzer Co.* (1918) 245 U.S. 531, 533–534 [62 L.Ed. 451, 38 S.Ct. 186].) To similar effect in rejecting a pass-on defense in the context of an illegal overcharge by railroad yards, Justice Brandeis wrote for the court: "Neither the fact of subsequent reimbursement . . . , nor the disposition which may hereafter be made of the damages recovered, is of any concern to the wrongdoers." (*Adams v. Mills* (1932) 286 U.S. 397, 407 [76 L.Ed. 1184, 52 S.Ct. 589].) To allow a pass-on defense would undermine the enforcement of the statutory scheme (there, the Interstate Commerce Act (49 U.S.C. former § 8)): "[T]he purpose of that section would be defeated if the tortfeasors were permitted to escape reparation by a plea that the ultimate incidence of the injury was not upon those who were compelled in the first instance to pay the unlawful charge." (*Adams v. Mills*, at p. 408.)

This rejection of using overcharge pass-ons as a defense occurs not because the law is blind to their existence, but rather because its eyes are open to their ubiquity. Justice Holmes, again: The disregard of pass-ons is in part a recognition of "the endlessness and futility of the effort to follow every transaction to its ultimate result. [Citation.] Probably in the end the public pays the damages in most cases of compensated torts." (*Southern Pac. Co. v. Darnell-Taenzer Co.*, *supra*, 245 U.S. at p. 534.) The *Hanover Shoe* court certainly acknowledged that a buyer faced with an overcharge might seek to pass on that overcharge. (*Hanover Shoe*, *supra*, 392 U.S. at pp. 489, 493.) What the court also recognized, however, was how much deeper down the rabbit hole one could go. Price fixing has primary consequences: the overcharge to direct purchasers. It may have secondary consequences: the pass-on to indirect purchasers. It may have tertiary consequences: the price increase may result in lost sales or profits, or lost market share for a buyer forced to compete with sellers not subject to the overcharge. (*Id.* at pp. 489–493.)[6] To trace every consequence of a monopoly or a price-fixing conspiracy is to encounter Holmes's "futility of the effort to follow every transaction to its ultimate result." (*Southern Pac. Co.*, at p. 534.) *Hanover Shoe* recognized fully the difficulties inherent in tracing an antitrust violation to its ultimate

---

[6] One can imagine still more remote consequences as well, such as changes in the value of a business as a going concern, or changes in buying patterns by consumers who substitute purchases of other products, with consequent positive and negative effects on the various distributors in the market. And so on, and so on.

consequences. (See *Hanover Shoe*, at p. 493.) The rule it adopted, which accounts only for the primary consequence (the overcharge), recognizes that to stop after consideration of primary and secondary consequences (the overcharge and any pass-on) would fail to properly account for a host of tertiary consequences and thus underestimate the impact of the overcharge, but that attempting to actually account for those tertiary consequences would often be both impractical, given the difficulties of proving "in the real economic world" (*ibid.*) the ultimate impacts of a price change, and a severe impairment to deterrence (*id.* at p. 494).

With this background, we turn to the issue in this case. Does the rule of *Hanover Shoe*, that a defensive pass-on theory may not be used to defeat an antitrust damages claim, apply under the Cartwright Act?

## II.   *The Cartwright Act and the Pass-on Defense*

### A.   *The Cartwright Act's Text and Early History*

■   We begin with the language of the statute. If the text is sufficiently clear to offer conclusive evidence of the statute's meaning, we need look no further. (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758 [47 Cal.Rptr.3d 216, 139 P.3d 1169].) If it is susceptible of multiple interpretations, however, we will divine the statute's meaning by turning to a variety of extrinsic sources, including the legislative history (e.g., *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1080–1081 [103 Cal.Rptr.3d 767, 222 P.3d 214]), the nature of the overall statutory scheme (e.g., *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 844–845 [69 Cal.Rptr.3d 96, 172 P.3d 402]), and consideration of the sorts of problems the Legislature was attempting to solve when it enacted the statute (e.g., *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1018 [22 Cal.Rptr.3d 876, 103 P.3d 276]).

■   Section 16750, subdivision (a) authorizes anyone "injured in his or her business or property" by actions forbidden under the Cartwright Act (§ 16700 et seq.) to recover three times the "damages sustained." Aside from an increase in the multiplier, to treble damages from the original double damages, this language has been carried forward essentially without change from the original version of the act.[7]

---

[7] As originally enacted, the Cartwright Act's private damages provision read: "In addition to the criminal and civil penalties herein provided, any person who shall be injured in his business or property by any other person or corporation or association or partnership, by reason of anything forbidden or declared to be unlawful by this act, may sue therefor . . . to recover twofold the damages by him sustained, and the costs of suit." (Stats. 1907, ch. 530, § 11, p. 987.)

We reject at the outset Manufacturers' contention that the choice of the words "damages sustained" (§ 16750, subd. (a)) or "damages by him sustained" (Stats. 1907, ch. 530, § 11, p. 987) establishes a particular legislative intent on the question whether a pass-on defense should be available. The express text says only that a party must have been "injured" by a Cartwright Act violation and may recover the resulting "damages sustained"; it says nothing about how the injury or damages are to be quantified. In the antitrust context, one might measure the damages from a violation any number of ways: e.g., the excess amount a party paid the violator (the overcharge) (see *Hanover Shoe, supra*, 392 U.S. at pp. 487–490); the sales a party lost as a result of the overcharge (lost sales) (see *Hanover Shoe*, at p. 493; *Kansas v. UtiliCorp United Inc.* (1990) 497 U.S. 199, 224 [111 L.Ed.2d 169, 110 S.Ct. 2807] (dis. opn. of White, J.); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc., supra*, 191 Cal.App.3d at p. 1353); the lost profit opportunity a party suffered due to increased costs (lost profits) (see *Hanover Shoe*, at p. 493 & fn. 9); or the impact on the value of a business as a going concern due to lost market share (see *B.W.I. Custom Kitchen*, at p. 1353). Put another way, one could in theory measure injury by considering only the primary consequences of a price conspiracy (the overcharge), as *Hanover Shoe* did; by considering only the primary and secondary consequences (the overcharge and pass-on), as Manufacturers argue; or by considering the primary, secondary, and tertiary consequences (as, for instance, *B.W.I. Custom Kitchen*, at p. 1353, theorized one might have to). The words of the statute themselves dictate no particular choice among these options, nor any particular conclusion as to whether a pass-on defense should be available.

That the text of the Cartwright Act is ambiguous on this point is further illustrated by the fact the United States Supreme Court, interpreting the essentially identical language of the federal Clayton Act (15 U.S.C. § 12 et seq.), reached a conclusion diametrically opposite to that of the Court of Appeal in this case. Construing the Clayton Act's damages provision ("damages by him sustained"),[8] the Supreme Court concluded defensive use of a pass-on theory was prohibited (*Hanover Shoe, supra*, 392 U.S. at pp. 489–494); construing the Cartwright Act's damages provision ("damages sustained"),[9] the Court of Appeal here concluded such use of a pass-on theory was permitted, indeed compelled. Nor is *Hanover Shoe* an anomaly; addressing a federal damages provision mirroring that of the Cartwright Act, the Supreme Court in *Adams v. Mills, supra*, 286 U.S. at pages 406–408, likewise rejected the defendants' pass-on theory.[10] This divergence illustrates not that

---

[8] Title 15 United States Code section 15(a).

[9] Section 16750, subdivision (a).

[10] At issue was a claim under section 8 of the Interstate Commerce Act (49 U.S.C. former § 8), which created liability for "the full amount of damages sustained" because of overcharges and other violations.

either conclusion must be wrong, only that reasonable jurists may—from a text as opaque as "damages sustained"—arrive at widely differing conclusions, and that that text is thus susceptible of being read as supporting more than one rule for measuring damages.[11] The question we face is how to *measure* "damages sustained," and nothing in the Cartwright Act's language, as enacted in 1907 or thereafter amended, resolves that question. Insofar as the text of the Cartwright Act is concerned, the question is an open one.

We reject as well a second interpretive argument pressed by Manufacturers and adopted by the Court of Appeal: that at the beginning of the 20th century there was an existing, generally understood meaning for "damages by him sustained," and we therefore should presume the Legislature intended that meaning when it used the phrase in the Cartwright Act.

The general principle that we should assume the Legislature uses words in accordance with their commonly understood meaning is sound. In *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147 [252 Cal.Rptr. 221, 762 P.2d 385], for example, we interpreted ambiguous provisions of the Cartwright Act by considering whether extant law established an accepted meaning for the chosen terms. Because our research disclosed an accepted understanding that a prohibition against a "combination" did not extend to mergers, we concluded the Legislature surely knew of and adopted that understanding when it passed the Cartwright Act. (*State of California ex rel. Van de Kamp v. Texaco, Inc.*, at pp. 1160–1163.)

That principle has no similar application here. We can discern no contemporaneous consensus with respect to the phrase "damages by him sustained." The Cartwright Act was passed in 1907 as part of a wave of turn-of-the-century state and federal legislation intended to stem the power of monopolies and cartels. (Landry & Hornbeck, *One Hundred Years in the Making: The Cartwright Act in Broad Outline* (2008) 17, No. 2, J. Antitrust and Unfair Competition Section of State Bar 7, 7–8; *State of California ex rel. Van de*

---

[11] Manufacturers argue that *Hanover Shoe, supra,* 392 U.S. 481, is not evidence of textual ambiguity because it was not a statutory interpretation case. We disagree. The United States Supreme Court itself has indicated *Hanover Shoe* resolved "a question of statutory interpretation," namely, the "proper construction of § 4 of the Clayton Act [15 U.S.C. § 15]." (*California v. ARC America Corp.* (1989) 490 U.S. 93, 103 [104 L.Ed.2d 86, 109 S.Ct. 1661].) More fundamentally, while it is true *Hanover Shoe* did not discuss how best to interpret the phrase "damages by him sustained," that omission implicitly acknowledges that an exegesis of those few words would have yielded no answers. Tasked with interpreting a statute, courts resort to all manner of tools to divine intent. Where in one case the text or legislative history may produce a clear answer, in another it may lead only to a dead end. Courts do not often catalogue every blind alley; that *Hanover Shoe* did not address the statutory text's opacity is of no significance. That the Supreme Court relied on nontextual tools to construe the Clayton Act *is* significant; it demonstrates the court's conclusion that the text itself was not restrictive enough to specify a unique measure of damages—that it was, in short, ambiguous.

*Kamp v. Texaco, Inc., supra*, 46 Cal.3d at pp. 1154–1156; see generally Limbaugh, *Historic Origins of Anti-trust Legislation* (1953) 18 Mo. L.Rev. 215.) It was based in part on other recently enacted state laws aimed at the same problems. (*State of California ex rel. Van de Kamp v. Texaco, Inc.*, at pp. 1160–1162 & fn. 14; Hibner & Cooper, *The Cartwright Act at 100—A History of Complementary Antitrust Enforcement—A Celebration* (2008) 17, No. 2, J. Antitrust and Unfair Competition Section of State Bar 81, 91–92.) The phrase "damages sustained" or "damages by him sustained" was routinely employed in the remedial provisions of the antitrust statutes of the time.[12] However, our review of out-of-state and federal decisions in the years preceding the Cartwright Act's 1907 adoption discloses nothing (never mind a consensus) speaking to how the "damages by him sustained" should be measured or allocated between direct and indirect purchasers who seek to sue for antitrust loss.

Certainly the California cases relied on by Manufacturers and the Court of Appeal do not establish any consensus as to how damages were to be measured. In *De Costa v. Mass. Mining Co.* (1861) 17 Cal. 613, 617, a nuisance case, we explained that the damages for creating an unwanted ditch on another's property were confined to the injury sustained, the diminution in the value of the property in its present condition, rather than the full cost of remediation (filling in the ditch). In *Utter v. Chapman* (1869) 38 Cal. 659, 664–666, a breach of contract case, we explained that the plaintiff steamship operator could not automatically recover the full contract price for shipping grain the defendant failed to provide. The plaintiff had a duty to mitigate by finding substitute employment for his steamer, such as transporting grain for other parties, and, to the extent he was able to do so, his damages were thereby diminished. In *Hicks v. Drew* (1897) 117 Cal. 305, 314–315 [49 P. 189], a tort action for injury to real property, we indicated damages should be measured based on the net impact of the defendant's actions, offsetting any benefit to the plaintiff against any loss.

These contract and tort cases are unhelpful on the question of how to measure the "damages sustained" in an antitrust case. They express in a variety of contexts the truism that damages are to compensate for actual loss, but this, again, begs the question before us: *how* to measure actual loss in the context of an intermediary-purchaser antitrust action for price fixing.

---

[12] E.g., Sherman Antitrust Act of 1890 (Act of July 2, 1890, ch. 647, § 7, 26 Stat. 209, 210) ("damages by him sustained"); 1899 Michigan Public Acts, No. 255, section 11, page 412 ("damages by him sustained"); 1907 Missouri Laws, page 380 (Mo. Rev. Stat., former § 8972) ("damages by him sustained"); 1905 Nebraska Laws, chapter 162, section 18, page 644 ("damages by him sustained"); 1898 Ohio Laws, section 11, page 146 (former Ohio Gen. Code, § 6397) ("damages by him sustained"); 1893 Oklahoma Revised Statutes, chapter 83, section 4, page 1163 ("damages sustained"); 1898 Utah Revised Statutes, title 54, section 1761, page 424 ("damages sustained").

Notably as well, in 1907 an antitrust claim for civil money damages was a wholly new kind of claim, part of the "dramatically enhanced sanctions imposed by the [Cartwright] Act." (*State of California ex rel. Van de Kamp v. Texaco, Inc., supra,* 46 Cal.3d at p. 1167.) At common law, no such private claim existed; remedies for illegal agreements and restraints on trade were confined to proceedings to hold the agreements void and unenforceable and to revoke corporate privileges. (*Ibid.*) Thus, no reason exists to assume the Legislature intended to incorporate any particular existing method of measuring damages derived from statutory or common law precedent, including the common law contract and tort damage measures on which Manufacturers rely.[13]

More generally, we consider it implausible that the Legislature had any specific intent on the question we face. Certainly nothing in what minimal legislative history has survived from the Cartwright Act's 1907 enactment sheds any direct light on the question. The economic theories that underlie an antitrust claim are sufficiently complex that we may safely surmise the fine points of whether enforcement by direct and indirect purchasers should be permitted or preferred, and what precise proof of passed-on costs, lost sales, and lost profits should become the grist of an antitrust trial, were not at the forefront of the Legislature's mind when enacting what was then a pioneering law. Certainly by its choice of the generic phrases "damages by him sustained" and "injured in his business or property," the Legislature did not presume to resolve these complex questions.

Two early Court of Appeal Cartwright Act cases relied on by Manufacturers do not lead us to a different conclusion. *Krigbaum v. Sbarbaro* (1913) 23 Cal.App. 427 [138 P. 364] is a case about antitrust causation, i.e., the notion that to have an antitrust claim one must establish a causal nexus between one's injury and the alleged unlawful restraint of trade. (See *Associated General Contractors v. Carpenters* (1983) 459 U.S. 519, 540–542 [74 L.Ed.2d 723, 103 S.Ct. 897]; *Vinci v. Waste Management, Inc.* (1995) 36 Cal.App.4th 1811, 1814 [43 Cal.Rptr.2d 337].) In *Krigbaum,* the plaintiff alleged the defendants had conspired to monopolize the market for vineyard-quality land, but his injury arose not from any restraints on trade accomplished by the alleged trust; rather, it arose from specific actions the defendants took to interfere with a particular real estate transaction he had brokered. (*Krigbaum,*

---

[13] Nor do generic contract and tort damage cases address the significant antitrust-only policy concerns that have motivated the United States Supreme Court in its reading of the Sherman and Clayton Acts (15 U.S.C. § 1 et seq.; *id.,* § 12 et seq.) and that must influence our reading of the Cartwright Act.

at pp. 433–434.) Because the plaintiff had not alleged causation, a demurrer to his Cartwright Act claim was properly sustained. (*Ibid.*) *Krigbaum* has nothing to say on the general topic that concerns us: when (as here) causation *has* been properly alleged, how are antitrust damages to be measured?

Equally unilluminating is *Overland P. Co. v. Union L. Co.* (1922) 57 Cal.App. 366 [207 P. 412], another antitrust causation case. The plaintiff, a printing and publishing company, alleged the defendant printing trade association had agreed to limit bidding for certain printing jobs, thereby driving up prices. As the Court of Appeal there correctly explained, nothing about this arrangement caused the plaintiff injury; instead, the decision of the plaintiff's competitors not to bid for work reduced the competition for the plaintiff and likely benefited it. (*Id.* at pp. 374–375.) Here, in contrast, Pharmacies are not Manufacturers' competitors but their indirect customers, and they have properly alleged that Manufacturers' price-fixing conspiracy caused them injury in the form of higher prices. As with *Krigbaum v. Sbarbaro, supra,* 23 Cal.App. 427, nothing in the *Overland P.* court's discussion speaks to how we should measure the damages of those plaintiffs who have alleged causation.

■ In the absence of textual guidance, we must turn elsewhere. We thus look to the Legislature's subsequent amendments to related parts of the Cartwright Act, and we consider as well "the object which [the Cartwright Act] seeks to achieve and the evil which it seeks to prevent . . . ." (*Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 669 [150 Cal.Rptr. 250, 586 P.2d 564]; see also *Burris v. Superior Court, supra,* 34 Cal.4th at p. 1018 ["we must consider the human problems the Legislature sought to address in adopting [the statute]"].)

Consideration of these sources leads us to conclude the federal *Hanover Shoe* rule (*Hanover Shoe, supra,* 392 U.S. at p. 494) is most consistent with legislative intent and applies equally to state claims under the Cartwright Act. Every indication available from the Legislature demonstrates that, given a choice, it would prefer an enforcement regime in which *Hanover Shoe* is the law. In particular, the Legislature's actions at two closely related points in time are telling: (1) in 1977, following Congress's passage of the Hart-Scott-Rodino amendments to the federal Clayton Act (15 U.S.C. § 12 et seq.); and (2) in 1978, in the immediate aftermath of the United States Supreme Court's decision in *Illinois Brick, supra,* 431 U.S. 720.

B. *The Cartwright Act's Amendment History*

1. *Cartwright Act amendment in response to federal legislation*

a. *The Hart-Scott-Rodino Act*

Congress amended the Clayton Act (15 U.S.C. § 12 et seq.) by passing the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the Hart-Scott-Rodino Act). The Hart-Scott-Rodino Act authorized state attorneys general to file *parens patriae* suits[14] on behalf of injured consumers for violations of the Sherman Act (15 U.S.C. § 1 et seq.). (15 U.S.C. § 15c(a)(1).) Congress created the remedy out of concern that consumers, the indirect purchasers who typically bear the brunt of antitrust violations in the form of higher prices, had no existing effective redress because the small amounts of their injuries made individual suits impracticable, and consumer class actions had proven a disappointing vehicle for antitrust enforcement. (H.R.Rep. No. 94-499, 2d Sess. (1976), reprinted in 1976 U.S. Code Cong. & Admin. News, pp. 2573–2577.) The Hart-Scott-Rodino Act was designed to fill the remedial gap that "sometimes result[ed] in the unjust enrichment of antitrust violators and undermine[d] the deterrent effect of the treble damage action." (*Id.* at pp. 2573–2574.) The remedial provisions of the Hart-Scott-Rodino Act focused on achieving full disgorgement of all illegal antitrust profits, using fluid recovery and the *cy près* doctrine if necessary, because "[t]he only alternative—retention of the profits by the adjudicated wrongdoer—is unconscionable and unacceptable." (*Id.* at pp. 2585–2586; see also *id.* at p. 2585 ["[T]he premise of § 4D [codified at 15 U.S.C. § 15d] is that defendants should be made to disgorge all measurable profits from an antitrust violation . . . ."].)

Notably, the Hart-Scott-Rodino Act originally contained no language to address the possibility that indirect purchasers might recover damages (through their respective attorneys general) when in some instances those same damages might already have been recovered by direct purchasers under the *Hanover Shoe* rule prohibiting a pass-on defense (see *Hanover Shoe*, *supra*, 392 U.S. at p. 494). The problem of potential double recovery under *Hanover Shoe* was solved by a Senate amendment excluding from *parens patriae* damage awards any amount that "duplicates amounts which have been awarded for the same injury." (15 U.S.C. § 15c(a)(1); see Sen.Rep.

---

[14] " ' "Parens patriae," literally "parent of the country," refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability [¶] . . . [¶] State attorney generals [*sic*] have *parens patriae* authority to bring actions on behalf of state residents for anti-trust offenses and to recover on their behalf.' " (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1148, fn. 6 [69 Cal.Rptr.2d 329, 947 P.2d 291].)

No. 94-803, 2d Sess., p. 44 (1976).) As the Senate Report accompanying the amendment explained, the proviso was inserted to "assure that defendants are not subjected to duplicative liability, particularly in a chain-of-distribution situation where it is claimed that middlemen absorbed all or part of the illegal overcharge," and to thereby eliminate any perceived tension between authorizing indirect purchaser suits and following *Hanover Shoe.* (Sen.Rep. No. 94-803, *supra*, at p. 44.)[15] Specifically, the amendment was intended to codify *In re Western Liquid Asphalt Cases* (9th Cir. 1973) 487 F.2d 191, a case that relied on the sufficiency of consolidation, interpleader, compulsory joinder, and the like, rather than a bar on indirect purchaser suits, to eliminate double recovery problems. (*Id.* at p. 201.) "Where the choice is between a windfall to intermediaries or letting guilty defendants go free, liability is imposed." (Sen.Rep. No. 94-803, *supra*, at p. 44, citing *Hanover Shoe, supra*, 392 U.S. at p. 494.)

The Hart-Scott-Rodino Act was thus of a piece with *Hanover Shoe.* First, consistent with the policies spelled out by the United States Supreme Court, it reflected Congress's belief that it was better to overdeter antitrust violations than to underdeter them, as well as Congress's desire to create a remedial framework that maximized the likelihood violators would be required to fully disgorge price-fixing profits. (See H.R.Rep. No. 94-499, *supra*, reprinted in 1976 U.S. Code Cong. & Admin. News, pp. 2573–2586.) Second, the Hart-Scott-Rodino Act expressly contemplated that antitrust violators might be sued by both direct and indirect purchasers, and that rather than limiting direct purchaser recoveries—by repudiating *Hanover Shoe*—or limiting indirect purchaser suits, the problem of duplicative recoveries could be addressed by allowing damages already paid to be offset against subsequent damages claims. (See 15 U.S.C. § 15c(a)(1).)

b.   *The legislative response to the Hart-Scott-Rodino Act*

The Legislature moved quickly to incorporate the remedial framework of the Hart-Scott-Rodino Act into the Cartwright Act, enacting a statute that precisely tracked the federal act and authorized the Attorney General to sue for Cartwright Act violations on behalf of consumers. (§ 16760, added by

---

[15] Bill author Representative Peter Rodino made the same point, explaining on the House floor that the Hart-Scott-Rodino Act had been specifically tailored, through Senate amendments to the bill that became new section 4C(a)(1) of the Clayton Act (15 U.S.C. § 15c(a)(1)), to allow the *Hanover Shoe* no pass-on defense rule to coexist hand in hand with the bill's new *parens patriae* suits on behalf of indirect purchasers. (Remarks of Rep. Rodino, Debate on H.R. No. 8532, 94th Cong., 2d Sess., 122 Cong. Rec. H30878–H30879 (daily ed. Sept. 16, 1976).)

Stats. 1977, ch. 543, § 1, p. 1747.)[16] Notably for our purposes, the Legislature adopted as well the Hart-Scott-Rodino Act's damages provision. (Compare § 16760, subd. (a)(1) [any award must exclude damages "which duplicate[] amounts which have been awarded for the same injury"] with 15 U.S.C. § 15c(a)(1) [same].) As we have discussed, that provision was specifically designed to account for duplicative damage awards resulting from allowing indirect purchasers to recover damages when, under the *Hanover Shoe* no pass-on defense rule (*Hanover Shoe, supra,* 392 U.S. at p. 494), direct purchasers might already have been awarded those same damages. Section 16760, subdivision (a)(1), in parallel with the corresponding provision in the Hart-Scott-Rodino Act, thus took as its premise that under the Cartwright Act direct purchasers could themselves recover overcharges that might in theory have been passed on to indirect purchasers, that is, the *Hanover Shoe* rule. Evidently, then, the Legislature presumed that such a rule would apply to the Cartwright Act as well.

■ Two additional factors suggest the Legislature took as a given the application of *Hanover Shoe*'s no pass-on defense rule to the Cartwright Act. First, we may presume that when the Legislature borrows a federal statute and enacts it into state law, it has considered and is aware of the legislative history behind that enactment. (*People v. Butler* (1996) 43 Cal.App.4th 1224, 1244 [51 Cal.Rptr.2d 150]; see also *American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 447 [186 Cal.Rptr. 235, 651 P.2d 822] [the legislative history of a federal statute may be used to interpret a state statute based on it].) Second, Assembly Bill No. 1162's legislative history indicates members of the Legislature were in fact aware of the legislative history behind, and the import of, the various portions of the Hart-Scott-Rodino Act they incorporated into state law. The Assembly Judiciary Committee's materials for Assembly Bill No. 1162 include by way of explanation for the bill and its purpose excerpts from the Hart-Scott-Rodino Act's legislative history, including remarks from Representative Rodino describing at length how the no-duplicative-recovery provision of title 15 United States Code section 15c(a)(1) was adopted to accommodate the effects of applying the *Hanover Shoe* rule. (See Assem.

---

[16] See Assembly Office of Research, third reading analysis of Assembly Bill No. 1162 (1977–1978 Reg. Sess.) as amended May 17, 1977, page 1 ("The bill is modeled directly on federal law"); Senate Committee on Judiciary, Analysis of Assembly Bill No. 1162 (1977–1978 Reg. Sess.) as amended May 17, 1977, page 2 ("This bill would enact into California law essentially the same provisions which were enacted last year by Congress and put into Federal law"). Notably, the text of section 16760 shows the Legislature shared Congress's preference for maximizing deterrence and ensuring full disgorgement of profits generated by antitrust violations: section 16760 expressly authorizes the use of *cy près* and fluid recovery to maximize distribution to those harmed, with any excess to go to the Attorney General as costs or to the state as unclaimed property, rather than reverting to the wrongdoer. (§ 16760, subd. (e)(1)–(3).)

Com. on Judiciary, Worksheet on Assem. Bill No. 1162 (1977–1978 Reg. Sess.) as introduced Mar. 29, 1977 [attachments excerpting Sept. 16, 1976 remarks of Rep. Rodino].)

Manufacturers argue it would be absurd to conclude the Legislature that passed Assembly Bill No. 1162 (1977–1978 Reg. Sess.), strengthening consumer antitrust protections, also approved the *Hanover Shoe* rule, which might in a hypothetical case impair consumer recoveries. Manufacturers posit a scenario in which an intermediary purchaser (such as Pharmacies here) sues first, recovers the full measure of any overcharge under *Hanover Shoe*, and leaves nothing for the ultimate consumers (because § 16760's duplicative-liability language would exclude the previous recovery from an antitrust defendant's future liability).

We have no difficulty reconciling Assembly Bill No. 1162's consumer-protecting provisions with tacit approval of the *Hanover Shoe* rule. In the abstract, both rules are intended to achieve the same goal: maximum deterrence and disgorgement. If the *Hanover Shoe* rule enhances enforcement and deters to some degree future antitrust violations, consumers benefit. As for the specific hypothetical, it posits a scenario in which an antitrust suit is filed, a full award is made against the defendants, and the case becomes final, all before the four-year statute of limitations expires and before the Attorney General has any opportunity to file suit. The Legislature could easily have assumed that this would be a rare scenario indeed, and that the short statute of limitations (at least in comparison with the time it takes to resolve an antitrust case), combined with the availability of devices such as joinder, interpleader, and case consolidation, would make such a scenario the exception rather than the rule. (See *Union Carbide Corp. v. Superior Court* (1984) 36 Cal.3d 15, 24 [201 Cal.Rptr. 580, 679 P.2d 14] [noting that where suits are pending at the same time, consolidation can be employed, and the practical likelihood of sequential suits is " 'remote' " because " '[t]he extended nature of antitrust actions, often involving years of discovery, combines with the short four-year statute of limitations to make it impractical for potential plaintiffs to sit on their rights until after entry of judgment in the earlier suit' "].)[17]

In short, the Legislature decided to include in its new *parens patriae* statute a protection against the occasional potential for double recovery that arises when indirect purchasers can sue but direct purchasers are not subject

---

[17] This case is perhaps far more typical. Pharmacies, intermediary purchasers, filed suit in 2004; had any consumers sought recovery of the same amounts Pharmacies seek (i.e., recovery for the years 2000–2004), they would have had to file suit long before now, and their actions could have been consolidated or coordinated without any risk of an award in this case impairing relief in any such hypothetical other case.

to a pass-on defense, a provision created under the specific belief that *Hanover Shoe* would apply. From this, we may infer the Legislature approved application of *Hanover Shoe* to the Cartwright Act.

### 2. *Cartwright Act amendment in response to* Illinois Brick

#### a. *The sequel to* Hanover Shoe: Illinois Brick

Nine years after *Hanover Shoe, supra,* 392 U.S. 481, the United States Supreme Court was pressed to decide whether the bar on defensive use of a pass-on theory (the claim a direct purchaser could not sue because it had passed on any overcharge) should be extended to the offensive use of a pass-on theory (the claim by an indirect purchaser that it, too, had suffered antitrust injury because overcharges had been passed on to it by the direct purchaser and perhaps additional intermediary indirect purchasers). In *Illinois Brick, supra,* 431 U.S. 720, a sharply divided court concluded that just as defendants could not raise a pass-on theory as a defense, so indirect purchasers could not use a pass-on theory to sue for overcharges arising from antitrust violations.

Plaintiff the State of Illinois sued concrete block manufacturers for price fixing in violation of the Sherman Act (15 U.S.C. § 1 et seq.), alleging that the manufacturers had illegally increased prices and those increases were passed on to masonry contractors, who passed them on to general contractors, who charged more in their bids to build buildings for the State of Illinois and other government entities. (*Illinois Brick, supra,* 431 U.S. at pp. 726–727.) Again writing for the majority, Justice White explained that the availability of a pass-on defense should be symmetric. First, allowing offensive but not defensive pass-on claims would create a risk of double recovery in those cases where both direct and indirect purchasers sued, with a defendant paying the entirety of any overcharge to the direct purchaser and some additional amount to the indirect purchaser. (*Id.* at pp. 730–731.) Second, the uncertainties involved in tracing overcharges and the risk of overcomplicating antitrust trials extended equally to offensive pass-on cases as to defensive pass-on cases. (*Id.* at pp. 731–732.) Third, *Hanover Shoe* "rest[ed] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." (*Illinois Brick,* at p. 735.) Because no exception applied that would have allowed defensive use of a pass-on theory—and because *Hanover Shoe* was still sound law and should not be overruled—Illinois could not use a pass-on theory offensively and, as an indirect purchaser, could recover nothing.

The dissenters agreed fully that *Hanover Shoe* was good law, but concluded the same considerations that animated it dictated a rule *allowing* indirect purchaser suits. (See *Illinois Brick, supra,* 431 U.S. at pp. 749–750 (dis. opn. of Brennan, J.).) In *Hanover Shoe,* the court had chosen to run the risk of overcompensating a plaintiff rather than underdeterring antitrust violations and allowing antitrust violators to retain their ill-gotten gains. In an offensive pass-on case, there was no danger that recognizing pass-on charges would allow a defendant to escape liability; rather, allowing a pass-on claim would advance the goal of preventing wrongdoers from escaping punishment. (*Illinois Brick,* at pp. 752–753.) The dissenters asserted that " '[t]he attempt to transform a rejection of a defense because it unduly hampers antitrust enforcement into a reason for a complete refusal to entertain the claims of a certain class of plaintiffs seems an ingenious attempt to turn the decision [in *Hanover Shoe*] and its underlying rationale on its head.' " (*Id.* at pp. 753–754.) The majority's concerns about double recovery, the dissenters argued, could be addressed fully through procedural devices (joinder, interpleader, and the like) in instances where double recovery was a risk, without resort to the majority's blanket ban on indirect purchaser suits. (*Id.* at pp. 761–764.)

### b. *The legislative response to* Illinois Brick

*Illinois Brick, supra,* 431 U.S. 720, evoked an immediate legislative response. Within months of the decision, Assembly Bill No. 3222 (1977–1978 Reg. Sess.) was introduced to prevent *Illinois Brick* from having any effect on judicial interpretation of the Cartwright Act.[18] This "*Illinois Brick* repealer" bill passed both houses unanimously and wrote into the Cartwright Act a repudiation of *Illinois Brick*'s ban on indirect purchaser suits, allowing suit by any injured person "regardless of whether such injured person dealt directly or indirectly with the defendant." (§ 16750, subd. (a), added by Stats. 1978, ch. 536, § 1, p. 1693; see *Union Carbide Corp. v. Superior Court, supra,* 36 Cal.3d at pp. 19–20 [explaining that § 16750 was

---

[18] At the time, federal antitrust cases were treated as "applicable" (*Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481]) and "authoritative" (*Shasta Douglas Oil Co. v. Work* (1963) 212 Cal.App.2d 618, 625 [28 Cal.Rptr. 190]) on Cartwright Act questions. Consequently, the Legislature feared *Illinois Brick*'s rule would be applied equally to the Cartwright Act. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3222 (1977–1978 Reg. Sess.) as introduced Mar. 27, 1978, p. 1 [bill introduced to "prevent a federal case interpretation of the Sherman Act precluding an indirect purchaser's standing to sue in antitrust actions [i.e., *Illinois Brick*] being applied to actions under the Cartwright Act"]; *id.* at p. 2 [explaining the bill was needed because federal antitrust decisions like *Illinois Brick* were "considered 'persuasive' in interpreting the provisions of the Cartwright Act"].)

amended to repudiate the *Illinois Brick* bar against indirect purchaser recovery].)[19] Reviewing the legislative history behind this enactment, we find indications the Legislature fully embraced the *Illinois Brick* dissent, including—critically for our purposes—its view that *Hanover Shoe, supra*, 392 U.S. 481, was a sound rule of law.

Passage of the *Illinois Brick* repealer statute was driven by the fear that indirect purchasers might be stripped of their standing to sue under the Cartwright Act because, under the reasoning of the *Illinois Brick* majority, application of the *Hanover Shoe* rule under the Cartwright Act could be interpreted as dictating that outcome. Rejecting that reasoning, the Assembly Judiciary Committee's summary of Assembly Bill No. 3222 (1977–1978 Reg. Sess.) cited with approval *Illinois Brick*'s "vigorous dissent." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3222 (1977–1978 Reg. Sess.) as introduced Mar. 27, 1978, p. 1.) It spelled out the dissent's critique of the majority's bar on indirect purchaser suits and indicated that as the "dissent noted . . . the implementation problems cited by the majority[20] could be addressed by the application of existing procedural requirements, e.g., mandatory joinder of the direct purchaser, interpleader, parens patriae." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3222 (1977–1978 Reg. Sess.) as introduced Mar. 27, 1978, pp. 1–2.) The Judiciary Committee's analysis thus accepted that allowing indirect purchaser suits would require courts to reconcile the existence of such suits with the *Hanover Shoe* no pass-on defense rule, and cited with approval the *Illinois Brick* dissent's proposed methods for reconciliation.

Nowhere in this or any other committee report did the Legislature suggest reconciliation could or should instead occur by repudiating *Hanover Shoe* under the Cartwright Act. Rather, the existence of the *Hanover Shoe* rule was taken as a given; the relevant debate was whether indirect purchaser suits could be accommodated in a world where *Hanover Shoe* was the law. The Legislature, like the *Illinois Brick* dissent, apparently preferred procedural devices to a blanket ban on indirect purchaser suits and passed Assembly Bill No. 3222 (1977–1978 Reg. Sess.) to clarify that that preference was part of

---

[19] California was not alone in this. To date, 25 states and the District of Columbia have passed *Illinois Brick* repealer statutes; numerous others have interpreted existing state law to allow indirect purchaser suits. (Karon, *"Your Honor, Tear Down that Illinois Brick Wall!" The National Movement Toward Indirect Purchaser Antitrust Standing and Consumer Justice* (2004) 30 Wm. Mitchell L.Rev. 1351, 1361–1362.) The Cartwright Act amendment and other like *Illinois Brick* repealer statutes have subsequently been upheld against preemption challenges. (*California v. ARC America Corp., supra*, 490 U.S. at pp. 105–106.)

[20] These implementation problems were those that would arise if indirect purchaser suits were permitted at the same time that *Hanover Shoe*'s bar on a pass-on defense remained in place. (See *Illinois Brick, supra*, 431 U.S. at pp. 737–747 (maj. opn.); *id.* at pp. 761–764 (dis. opn.).)

existing Cartwright Act law. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3222 (1977–1978 Reg. Sess.) as introduced Mar. 27, 1978, p. 2 [measure is "declarative of existing law"].) As with the passage of Assembly Bill No. 1162 (1977–1978 Reg. Sess.) the previous year, the Legislature's adoption of this amendment indicates acceptance of *Hanover Shoe, supra,* 392 U.S. 481.

### C. *Broader Legislative Policy Considerations*

In divining the Legislature's intent, we consider as well overarching legislative goals evident from the Legislature's adoption and amendment of the Cartwright Act over the years.

From its inception, the Cartwright Act has always been focused on the punishment of violators for the larger purpose of promoting free competition. (See Stats. 1907, ch. 530, p. 984 [the Cartwright Act is "An act to define trust and to provide for criminal penalties and civil damages, and punishment of [entities connected with trusts], and to promote free competition in commerce and all classes of business in this state"].) It is, like antitrust laws generally, about " ' " 'the protection of *competition,* not *competitors.*' " ' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 186 [83 Cal.Rptr.2d 548, 973 P.2d 527].) Private damage awards are just a tool by which these procompetitive purposes are carried out: " 'The main purpose of the anti-trust laws is to protect the public from monopolies and restraints of trade, and the individual right of action for treble damages is incidental and subordinate to that main purpose.' " (*Milton v. Hudson Sales Corp.* (1957) 152 Cal.App.2d 418, 443 [313 P.2d 936]; see also *Bruce's Juices v. Amer. Can Co.* (1947) 330 U.S. 743, 751 [91 L.Ed. 1219, 67 S.Ct. 1015] [private damage remedies provide "a strong and reliable motive for enforcement"]; *Cianci v. Superior Court* (1985) 40 Cal.3d 903, 913 [221 Cal.Rptr. 575, 710 P.2d 375] [private treble damages are designed " 'to serve as well the high purpose of enforcing the antitrust laws' "].)

As the Cartwright Act's primary concern is with the elimination of restraints of trade and impairments of the free market, we can and should select the damages rule most consistent with that focus. The goal of deterring antitrust violations and concerns that a given private party may receive a windfall are not of equal weight. The Legislature's adoption of a double damages remedy (Stats. 1907, ch. 530, § 11, p. 987), later amended to treble damages (§ 16750, subd. (a)), demonstrates as much: double and treble damages may overcompensate injured plaintiffs, but they do so in order to maximize deterrence.

These relative priorities offer useful guidance. In cases where no consumers have come forward and the choice is between allowing an antitrust

violator to retain the full measure of profits from its violation or requiring their disgorgement to an innocent direct or intermediary purchaser who paid those monies and was forced to cope with the violation, the Legislature surely would prefer the latter, thereby maximizing deterrence and the probability of full disgorgement.[21] To allow defendants universally to assert a pass-on defense, even in cases such as this that present no risk of duplicative recovery, would hamper enforcement by reducing incentives to sue and police antitrust violations.

As *Hanover Shoe* itself recognized, a universal pass-on defense would hamper enforcement in a second way. Allowing a pass-on defense would plunge parties and courts into minitrials attempting to trace every penny of an initial overcharge, as well as seeking to measure the further ramifications that an overcharge might have in the form of lost sales and other tertiary consequences. (*Hanover Shoe, supra,* 392 U.S. at pp. 492–493.) " '[T]he task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system.' " (*Kansas v. UtiliCorp United Inc., supra,* 497 U.S. at p. 211.) While the Legislature when it enacted the *Illinois Brick* repealer statute imposed that task for the small universe of cases in which multiple levels of purchasers might sue, rejection of the *Hanover Shoe* rule would extend that burden to nearly every case. Accepting the rule, in contrast, streamlines antitrust trials, renders the process of proving antitrust damages less daunting, and ultimately enhances enforcement.

Manufacturers raise one overarching policy concern of their own. They object that Pharmacies simply were not damaged by the alleged price-fixing conspiracy and the law should not countenance a rule that permits a windfall to undamaged plaintiffs.

This objection misconceives both the nature of the *Hanover Shoe* rule in general and its potential application here. The *Hanover Shoe* court recognized that a purchaser forced by a monopoly or price-fixing cartel to pay higher prices might well be injured by that antitrust violation *even in instances where it appeared the purchaser could pass on some or all of that overcharge downstream to others.* (*Hanover Shoe, supra,* 392 U.S. at p. 493, fn. 9 ["The mere fact that a price rise followed an unlawful cost increase does not show

---

[21] In a closely related vein, we previously have approved the use of fluid recovery funds under the Cartwright Act precisely because they might be the only way to "ensure that the policies of disgorgement or deterrence are realized" and because Cartwright Act defendants should not be "permitted to retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts." (*State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564].) The same considerations are in play here, where rejection of the *Hanover Shoe* rule would allow alleged antitrust violators to escape without sanction.

that the sufferer of the cost increase was undamaged."]; see also *Kansas v. UtiliCorp United Inc.*, *supra*, 497 U.S. at pp. 208–211.) A purchaser might lose profits or sales, and perhaps market share as well, vis-à-vis another purchaser/distributor not subject to the same overcharge. Recognizing the difficulty of proving the precise amount of other forms of injury, the *Hanover Shoe* court selected the amount of the initial overcharge as the measure of damages, not because the initial overpayment was the only injury, but because it was the most readily measured, and because measuring damages in this way would, in the long run, best serve the various goals of antitrust law. (See *Hanover Shoe*, at pp. 492–494; cf. 2A Areeda et al., Antitrust Law (3d ed. 2007) ¶ 395, p. 377 ["[T]he most commonly used measure of damages, *viz.*, the overcharge, is an ambiguous proxy for the actual damages suffered."].)

Some or all of the injuries identified in *Hanover Shoe*, *supra*, 392 U.S. 481, and *Kansas v. UtiliCorp United Inc.*, *supra*, 497 U.S. 199, are in play here. Evidence in the record indicates Pharmacies' contracts with third party payers were sometimes negotiable, and rates changed over time. Given an opportunity to do so, Pharmacies might have been able to prove lost profits on third party payer sales, that is, that in the absence of overcharges they could have negotiated reimbursement rates that would have increased the gap between their acquisition costs and reimbursement rates. Evidence in the record also indicated Pharmacies had seen fewer and fewer cash-paying customers over time and thus had unilateral pricing discretion for a smaller percentage of their sales. Given an opportunity to do so, Pharmacies might have been able to prove lost profits (because they could have maintained the same retail prices for cash-paying customers, while obtaining their drugs from wholesalers at a lower acquisition cost (see *Kansas v. UtiliCorp United Inc.*, at p. 209; *Hanover Shoe*, at p. 493, fn. 9)) or lost sales (due to cash-paying customers, who are sensitive to higher prices, filling fewer prescriptions than they would have if both acquisition costs and corresponding retail prices were lower).[22] Finally, Pharmacies alleged the value of their businesses as going concerns had declined due to lost sales, lost profits, and competition from foreign distributors not subject to Manufacturers' overcharges. As the cross-motions below focused on the pass-on defense, Pharmacies were not called on to bring forward evidence in support of this allegation. Of course, the rule of *Hanover Shoe* obviates the need for the parties and the trial court to develop and consider proof of these other forms of injury, not because they do not exist, but because, as noted, enforcement of the antitrust laws works better if the initial amount of the overcharge is

---

[22] Indeed, the possibility that in this latter scenario Pharmacies did *not* lose sales as a result of the alleged price-fixing conspiracy rests on the rather unlikely proposition that cash-paying customers' demand for drugs is wholly inelastic to price.

chosen as a default measure of all the injuries a price-fixing conspiracy may engender for a given purchaser.[23]

At its core, Manufacturers' argument is that the Cartwright Act should be read to go beyond the primary consequence of the price conspiracy (the overcharge) to consider the secondary consequence of the conspiracy (the pass-on), but that it should blind itself to the tertiary consequences (lost sales, lost profits, and so on). The Court of Appeal as well implicitly accepted *Hanover Shoe*'s focus on overcharges as the measure of damages and its corresponding disregard for tertiary consequences, but rejected that case insofar as it disregarded secondary consequences (the pass-on). But these two aspects of *Hanover Shoe* go hand in hand: *Hanover Shoe* found it acceptable to ignore tertiary consequences only because it *also* disregarded secondary consequences. Put differently, *Hanover Shoe* is not a case about what constitutes injury, but about how to measure damages. That a purchaser passes on an overcharge does *not* mean it lacks for injury or damages. The *Hanover Shoe* court disregarded all tertiary damages for measurement purposes because, and only because, it also disregarded the secondary pass-on for measurement purposes. Conversely, one cannot rationally admit evidence of a pass-on, under a theory of mitigation, while also excluding evidence that the pass-on in fact failed to mitigate fully the loss occasioned by the original overcharge. (See *Hanover Shoe, supra,* 392 U.S. at pp. 491–494; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc., supra,* 191 Cal.App.3d at p. 1353.)[24] Instead, the choice in measuring damages is between a rule that for policy reasons considers only the overcharge (the *Hanover Shoe* rule) and one that considers *all* the consequences of the overcharge.

---

[23] Manufacturers argue, and the Court of Appeal agreed, that Pharmacies waived these other forms of injury. The record does not support this claim. Pharmacies expressly did not concede that they had suffered no other injuries as a result of the alleged price-fixing conspiracy. Rather, they waived any attempt to prove other injuries because those injuries' existence and measure were legally irrelevant under *Hanover Shoe,* the rule Pharmacies contended applied under the Cartwright Act. As we agree that *Hanover Shoe* applies, we need not consider whether, had we concluded it did not, Pharmacies should have been permitted to prove injuries other than the overcharge in this case. (Cf. *B.W.I. Custom Kitchen v. Owens-Illinois, Inc., supra,* 191 Cal.App.3d at p. 1353 [if the pass-on defense applies, plaintiffs should have the opportunity to prove other injuries].)

[24] We are aware of no statute or case that adopts such an in-between rule, and Manufacturers have cited none. The irrationality of such a rule is inferable as well from the United States Supreme Court's own precedents. To prevail on a pass-on defense in those rare instances where it has been permitted under federal law, a defendant must show the plaintiff could not have raised rates otherwise (*Kansas v. UtiliCorp United Inc., supra,* 497 U.S. at p. 209; *Hanover Shoe, supra,* 392 U.S. at p. 493, fn. 9) and did not lose sales, because the quantity to be purchased was controlled by a preexisting "cost-plus" contract (*Kansas v. UtiliCorp United Inc.,* at p. 218; *Illinois Brick, supra,* 431 U.S. at p. 736; *Hanover Shoe,* at p. 494; see also Hovenkamp, *The Indirect-Purchaser Rule and Cost-Plus Sales* (1990) 103 Harv. L.Rev. 1717, 1720 [cost-plus contracts involve both a fixed markup and a fixed quantity to be delivered]). In essence, Supreme Court precedent recognizes that a pass-on defense (based on evidence of

### D.  *Conclusion*

■  The inferences we draw from the Legislature's actions and responses to developments in federal antitrust law, as well as its actions in enacting and amending the Cartwright Act over the years, all point in the same direction: For state antitrust purposes, the *Hanover Shoe* rule should apply even as indirect purchasers are allowed to sue. We therefore conclude, under the Cartwright Act as under federal law, that a pass-on defense generally may not be asserted. Instead, in an antitrust price-fixing case, the presumptive measure of damages is the amount of the overcharge paid by the plaintiff.

While a pass-on defense is generally precluded, a few instances remain in which it will still be available. First, *Hanover Shoe* recognized an exception for "cost-plus" contracts (*Hanover Shoe, supra*, 392 U.S. at p. 494) and, given the Legislature's endorsement of *Hanover Shoe*, that exception would apply to the Cartwright Act as well. Second, in light of the *Illinois Brick* repealer statute (§ 16750, subd. (a)), cases may arise where application of the *Hanover Shoe* rule raises the prospect of duplicative recovery. In instances where multiple levels of purchasers have sued, or where a risk remains they may sue, trial courts and parties have at their disposal and may employ joinder, interpleader, consolidation, and like procedural devices to bring all claimants before the court. In such cases, if damages must be allocated among the various levels of injured purchasers, the bar on consideration of pass-on evidence must necessarily be lifted; the defendants may assert a pass-on defense as needed to avoid duplication in the recovery of damages.

■  We need not address in detail the scope of these two exceptions, for neither applies here. Manufacturers have not sought to establish that any cost-plus contract exception would apply. Nor does it appear any wholesaler, consumer, or *parens patriae* suits have been filed that might pose a risk of duplicative recovery, and the statute of limitations for the period at issue has long since expired. Accordingly, the trial court erred in granting summary judgment for Manufacturers on the basis of a pass-on defense.

### III.  *The Unfair Competition Law*

In a claim closely related to their Cartwright Act claims, Pharmacies also alleged they had been injured by Manufacturers' unfair business practices and

---

secondary consequences) is only presentable in circumstances that foreclose the possibility of tertiary consequences (lost sales and profits). Only then can one fairly say in defense that the plaintiff has suffered no injury as the result of an illegal overcharge.

In contrast, in stable markup cases such as this one, where a purchaser's resale price is fixed as a direct function of its acquisition price so as to pass on any overcharge, the resale market's *response* to that overcharge-inflated resale price is *not* fixed and may be different than it would have been in the absence of the overcharge—and that different response (e.g., lower sales) may injure the plaintiff.

were entitled to relief under the UCL (§ 17200 et seq.). The Court of Appeal affirmed the trial court's grant of summary judgment to Manufacturers on the UCL claims, concluding Pharmacies lacked standing and, additionally, were ineligible for any relief. We consider each ground in turn.

### A. *Standing*

■ "The purpose of a standing requirement is to ensure that the courts will decide only actual controversies between parties with a sufficient interest in the subject matter of the dispute to press their case with vigor." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439 [261 Cal.Rptr. 574, 777 P.2d 610].) In 2004, the electorate substantially revised the UCL's standing requirement; where once private suits could be brought by "any person acting for the interests of itself, its members or the general public" (former § 17204, as amended by Stats. 1993, ch. 926, § 2, p. 5198), now private standing is limited to any "person who has suffered injury in fact and has lost money or property" as a result of unfair competition (§ 17204, as amended by Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004) § 3; see *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227–228 [46 Cal.Rptr.3d 57, 138 P.3d 207]). The intent of this change was to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of " 'clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant . . . .' " (*Californians for Disability Rights*, at p. 228, quoting Prop. 64, § 1, subd. (b)(3).)

While the voters clearly intended to restrict UCL standing, they just as plainly preserved standing for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices. (Prop. 64, § 1, subds. (b), (d); see § 17204.) Under that standard, Pharmacies have established standing. To distribute their pharmaceuticals, Manufacturers depend on a network of wholesalers and retailers. Pharmacies acted as retailers for Manufacturers' drugs and thus had indirect business dealings with Manufacturers. (See *Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491, 1499–1500 [65 Cal.Rptr.3d 634] [indirect purchases may support UCL standing].) They lost money: the overcharges they paid. (See *Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 854 [70 Cal.Rptr.3d 466] [§ 17204 standard is satisfied when the plaintiff has "expended money due to the defendant's acts of unfair competition"].) Finally, that loss was the result of an unfair business practice: Pharmacies paid more than they otherwise would have because of a price-fixing conspiracy in violation of state law. The voters' intent that under Proposition 64 suits be limited to those who suffer injury in fact is satisfied here. (See *Chattanooga Foundry v. Atlanta, supra,*

203 U.S. at p. 396 ["A person whose property is diminished by a payment of money wrongfully induced is injured in his property."].)

■ While Manufacturers argue that ultimately Pharmacies suffered no compensable loss because they were able to mitigate fully any injury by passing on the overcharges, this argument conflates the issue of standing with the issue of the remedies to which a party may be entitled. That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them. (See *Southern Pac. Co. v. Darnell-Taenzer Co.*, *supra*, 245 U.S. at p. 534 ["The plaintiffs suffered losses . . . when they [over]paid. Their claim accrued at once in the theory of the law and it does not inquire into later events."]; *Adams v. Mills*, *supra*, 286 U.S. at p. 407 ["In contemplation of law the claim for damages arose at the time the extra charge was paid," notwithstanding any subsequent reimbursement].) The doctrine of mitigation, where it applies, is a limitation on liability for damages, not a basis for extinguishing standing. (See *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1066 [232 Cal.Rptr. 528, 728 P.2d 1163] [" 'The rule of [mitigation of damages] comes into play after a legal wrong has occurred, but while some damages may still be averted . . . .' " (quoting Prosser & Keeton, Torts (5th ed. 1984) § 65, p. 458)].) This is so because mitigation, while it might diminish a party's recovery, does not diminish the party's interest in proving it is entitled to recovery.

Nothing in the text of section 17204 or Proposition 64 suggests the voters intended to provide otherwise when they remade the UCL's standing requirements. Rather, section 17204 requires only that a party have "lost money or property," and Pharmacies indisputably lost money when they paid an allegedly illegal overcharge. We decline Manufacturers' invitation to turn this facially simple threshold condition into a requirement that plaintiffs prove compensable loss at the outset.[25]

### B. *Remedies*

■ The Court of Appeal affirmed summary judgment on a second, overlapping ground: Pharmacies were not entitled to any remedy. Pharmacies' complaint seeks two forms of relief: restitution and an injunction. We need consider only the latter. If a party has standing under section 17204 (as Pharmacies do here), it may seek injunctive relief under section 17203. (See

---

[25] Doing so would render the UCL's standing requirement substantially *more* stringent than other state unfair competition statutes such as the Cartwright Act, under which Pharmacies' standing is undisputed. Again, we see nothing in the text or history of Proposition 64 that suggests the voters intended such a result.

§ 17204 [authorizing without limitation "[a]ctions for relief pursuant to this chapter" to be brought by parties who satisfy the provision's standing requirement].) Manufacturers' papers identify no obstacle that would preclude Pharmacies from obtaining injunctive relief if they establish Manufacturers were engaged in an unfair business practice.[26]

■ The Court of Appeal held Pharmacies were barred from seeking injunctive relief because, it concluded, they had suffered no monetary loss. To the extent this holding rests on the conclusion Pharmacies lacked standing under section 17204, it is erroneous; as discussed *ante*, Pharmacies have standing. To the extent the holding rests on the conclusion that even if Pharmacies had standing, they could not seek injunctive relief unless they could also seek restitution, it similarly is erroneous. Section 17203 makes injunctive relief "the primary form of relief available under the UCL," while restitution is merely "ancillary." (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 319 [93 Cal.Rptr.3d 559, 207 P.3d 20].) Nothing in the statute's language conditions a court's authority to order injunctive relief on the need in a given case to also order restitution. Accordingly, the right to seek injunctive relief under section 17203 is not dependent on the right to seek restitution; the two are wholly independent remedies. (See *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1268 [61 Cal.Rptr.2d 112, 931 P.2d 290] [§ 17203 "contains . . . no language of condition linking injunctive and restitutionary relief"]; *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1139 [111 Cal.Rptr.2d 296] [plaintiff could pursue injunctive relief even though restitution was unavailable].)

As the claim for injunctive relief is sufficient to preclude summary judgment, we need not decide, and express no opinion on, the further question whether Pharmacies may eventually be entitled to restitution.

---

[26] In this court, Manufacturers argue that Pharmacies have waived reliance on their complaint's request for injunctive relief to defeat summary adjudication. This argument misplaces the relevant burden. If Manufacturers sought summary judgment on the ground Pharmacies could obtain no relief on their UCL claim, it was incumbent on Manufacturers, as the moving party, to show that each form of relief sought by Pharmacies was unavailable. While Manufacturers attempted that showing with respect to the request for restitution, their moving papers simply ignored Pharmacies' request for injunctive relief.

In any event, the issue whether the availability of injunctive relief bars summary adjudication was decided by the Court of Appeal and fully briefed before us by the parties. It involves a pure issue of law, reviewable de novo. We may exercise our discretion to consider it. (See *People v. Superior Court (Laff)* (2001) 25 Cal.4th 703, 712, fn. 3 [107 Cal.Rptr.2d 323, 23 P.3d 563].)

## DISPOSITION

For the foregoing reasons, we reverse the Court of Appeal's judgment and remand for further proceedings not inconsistent with this opinion.

George, C. J., Baxter, J., Moreno, J., Ruvolo, J.,[*] Robie, J.,[†] and Miller, J.,[‡] concurred.

---

[*]Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[†]Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[‡]Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.