Filed 9/28/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re TOBACCO CASES II | D065165 |
| | (Super. Ct. No. JCCP4042) |

APPEALS from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge. Affirmed in part; dismissed in part.


Robinson Calcagnie Robinson Shapiro Davis, Inc., Mark P. Robinson, Jr., Kevin F. Calcagnie, Scot D. Wilson; Simon, Peragine, Smith & Redfearn, Robert L. Redfearn, Robert L. Redfearn, Jr., Douglas W. Redfearn; Dougherty, Hildre & Haklar, Donald F. Hildre and Thomas D. Haklar for Plaintiffs and Appellants.

Munger, Tolles & Olson, Gregory P. Stone, Martin D. Bern, Daniel B. Levin and Bethany W. Kristovich for Defendant and Appellant.

This action under the Unfair Competition Law (UCL) (Bus. and Prof. Code, § 17200 et seq.)[1] and the False Advertising Law (FAL) (§ 17500 et seq.) arises from Philip Morris USA, Inc.'s (Philip Morris) use of terms such as "Lights" and "Lowered Tar and Nicotine" in advertising Marlboro Lights, to indicate they were less unhealthful than Marlboro Reds and other full-flavored cigarettes. The trial court determined Marlboro Lights were no less dangerous than any other cigarettes, Philip Morris knew that, and its advertising was likely to deceive consumers. The court, however, denied plaintiffs' prayer for restitution on the ground they received value from Marlboro Lights apart from the deceptive advertising, and the evidence they submitted in an effort to show the difference between what they paid for Marlboro Lights and the value they actually received (*In re Vioxx Class of Cases* (2009) 180 Cal.App.4th 116, 131 (*Vioxx*)) was incompetent and inadmissible.

On appeal, plaintiffs do not challenge the court's finding that they received value from Marlboro Lights or its rejection of their evidence on consumer losses. Rather, they contend the court erred as a matter of law by determining the only measure of restitution in a UCL products action is the measure set forth in *Vioxx*. Plaintiffs assert value is immaterial, and they were not required to show any loss attributable to the deceptive advertising, because as an alternative measure the court had discretion to order Philip Morris to make a full refund of consumer expenditures, or its profits thereon, exclusively for the purpose of deterrence.

---

[1] Further statutory references are to the Business and Professions Code unless otherwise specified.

2

Plaintiffs also contend the court abused its discretion by denying injunctive relief on the ground of mootness. While a federal court opinion (*United States v. Philip Morris USA, Inc.* (D.D.C. 2006) 449 F.Supp.2d 1 (*Philip Morris I*), affirmed in relevant part in *United States v. Philip Morris USA, Inc.* (D.C.Cir. 2009) 566 F.3d 1095, 1124-1126, 1131-1134, 1136-1138), and federal legislation (21 U.S.C. § 387k(b)(2)(A)(i) & (ii)) have already enjoined tobacco companies' use of the objectionable descriptors, plaintiffs assert the matter is not moot because Philip Morris continues to market the cigarettes, now called Marlboro Gold, in light-colored packs, which ostensibly signifies they are less dangerous than Marlboro Reds or other cigarettes sold in dark-colored packs. Additionally, plaintiffs assert the court erred by denying them declaratory relief, awarding Philip Morris $764,552.73 in costs as the prevailing party under Code of Civil Procedure section 1032, and denying them sanctions under Code of Civil Procedure section 2033.420 for Philip Morris's failure to make admissions.

We conclude all of plaintiffs' points lack merit, and thus we affirm the judgment. Plaintiffs ignore well-established law on each point, and opt instead to rely on broad language from inapposite opinions. "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)

Philip Morris has filed a protective cross-appeal, challenging the propriety of class treatment. Philip Morris agrees the appeal should be dismissed if we affirm the judgment.

3

FACTUAL AND PROCEDURAL BACKGROUND

This action has a tortuous procedural history, but given the issues on appeal only a brief summary is required. The original complaint was filed in 1997 against several tobacco companies, but eventually Philip Morris was the only remaining defendant. The action was coordinated with several other actions under the caption *In re Tobacco Cases II* and assigned to Judge Ronald Prager.

In 2001, a seventh amended complaint was filed, which alleged that Philip Morris violated the UCL (§ 17200 et seq.) and the FAL (§ 17500 et seq.) through, among other things, its advertising of Marlboro Lights.[2] The court certified a class consisting of California residents who smoked cigarettes between 1993 and 2001 and were exposed to Philip Morris's advertising. In 2004, the court ruled that the Marlboro Lights issue was preempted by federal statute.

In November 2004, the voters approved Proposition 64, an initiative measure to amend the standing requirements for UCL actions. Under the new section 17204, a private UCL claim may be pursued "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." The court decertified the class on the ground the question of "whether class members could satisfy the standing requirements of Proposition 64 required individual inquiries." Before Proposition 64, a

_____

[2]    "A violation of the UCL's fraud prong is also a violation of the false advertising law (§ 17500 et seq.)." (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 312, fn. 8 (*Tobacco II*).) The trial court used "UCL" to refer to both UCL and FAL claims, noting "the remedy provisions of the UCL and FAL are interpreted in the same fashion and allow for the same type of relief." On appeal, the parties do the same, and thus we follow suit and discuss only the UCL.

4

UCL action could be brought by "any person acting for the interests of itself, its members or the general public." (Former § 17204.)

In 2009, the California Supreme Court reversed the decertification order. (*Tobacco II, supra,* 46 Cal.4th at p. 329.) *Tobacco II* holds that section 17204's standing requirements apply only to the class representative, and "that Proposition 64 was not intended to, and does not, impose section 17204's standing requirements on absent class members in a UCL class action where class requirements have otherwise been found to exist." (*Tobacco II,* at p. 324.) On remand, the trial court reinstated the Marlboro Lights claim in response to the United States Supreme Court's opinion in *Altria Group, Inc. v. Good* (2008) 555 U.S. 70.

In 2011, plaintiffs filed the operative eleventh amended complaint (complaint), with five named plaintiffs. One of them withdrew, and in 2012 the court ruled that only one of the remaining four, Trina Watton, had standing to represent the class with respect to the Marlboro Lights claim. The court "redefined the class objective as: 'All people who, at the time they were residents of California, smoked in California between January 1, 1998, and April 23, 2001, one or more Marlboro Lights cigarettes manufactured by Philip Morris . . . , and who were exposed to defendant's marketing and advertising activities in California.' "

In 2013, a bench trial was held over approximately 10 weeks. The court determined Philip Morris's advertising of Marlboro Lights was deceptive within the meaning of the UCL. The court found that the descriptors "Lights" and "lowered tar and nicotine" indicated Marlboro Lights delivered less tar and nicotine to smokers, and were

5

thus less harmful than full-flavored cigarettes such as Marlboro Reds. However, Philip Morris's own research from as early as the 1970's "revealed that, as actually smoked, . . . Lights provided no significant reduction in the amount of tar and nicotine ingested by most smokers." The court explained that "[i]n reality, . . . to make up for the reduced tar and nicotine . . . most smokers compensated by various means such as increasing the number of cigarettes smoked, the frequency of puffing, the degree of inhalation, and smoking more of the rod." Philip Morris executives admitted they knew Marlboro Lights "were just as harmful as Marlboro Reds and other full-flavored cigarettes but failed to disclose this information to consumers." After the class period, Philip Morris "placed onserts on 55 million packs of Marlboro Lights sold in California which truthfully stated that Marlboro Lights did not reduce the likelihood of disease and did not offer any health benefits."[3]

---

[3] "In May 2006, following seven years of litigation and a nine-month trial, United States District Court Judge Gladys Kessler issued a landmark decision in favor of the government in its RICO (Racketeering Influenced and Corrupt Organizations Act; [citation]) litigation against several tobacco companies," including Philip Morris. (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 50 (*Tobacco Cases I*); *Philip Morris I, supra,* 449 F.Supp.2d 1.) As is relevant here, Judge Kessler found by overwhelming evidence that Philip Morris and other cigarette manufacturers had "known for decades that there is no clear health benefit from smoking low tar/low nicotine cigarettes as opposed to conventional full-flavor cigarettes" (*Philip Morris I*, at p. 560), they nonetheless "extensively-and-successfully-marketed and promoted their low tar/light cigarettes as less harmful alternatives to full-flavor cigarettes" (*ibid.*) and "[b]y engaging in this deception, [they] dramatically increased their sales of low tar/light cigarettes, assuaged the fears of smokers about the health risks of smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking." (*Id.* at p. 561.)

6

The court, however, denied plaintiffs' prayer for restitution for lack of competent evidence of any loss attributable to the deceptive advertising. The court, relying on *Vioxx*, determined that since plaintiffs received value from Marlboro Lights apart from the deceptive advertising, the proper measure of restitution was the difference between the price paid and the actual value received. (*Vioxx, supra*, 180 Cal.App.4th at p. 131.)

The court rejected Watton's claim she purchased Marlboro Lights based exclusively on the advertising, because she admitted in cross-examination that she continued to purchase them for six years after learning they were no less harmful than Marlboro Reds or other full-flavored cigarettes.[4] The court also noted it heard extensive deposition testimony from absent class members, and "[a]pparently, most smokers who learned that Marlboro Lights were no healthier than Marlboro Reds believed Marlboro Lights . . . still provided reasonable value for the price they paid." Numerous absent class members expressly admitted their purchases of Marlboro Lights were wholly unrelated to health issues and were based on factors such as taste and smoothness, or their purchases were initially health related, but like Watton they continued to smoke Marlboro Lights many years after learning the truth.

The court noted that in an effort to calculate a price/value differential, plaintiffs relied exclusively on an online "conjoint survey" designed and conducted by Joel Steckel, Ph.D. Dr. Steckel asked 652 participants to choose between hypothetical cigarette

---

[4]     We reject plaintiffs' claim this testimony does not indicate Watton received any value from Marlboro Lights, it merely shows she had a tobacco addiction. Plaintiffs point to no evidence she was addicted to Marlboro Lights and could not switch to another type of cigarette.

products based on four features: taste, price, health risks, and pack type. He used "off-the-shelf Sawtooth software to generate 10,000 draws, or estimated choices, based on each [participant's] selections. Using the computer output from these simulated choices Dr. Steckel compared the utility that survey [participants] purportedly placed on the health risks of Marlboro Lights to Marlboro Reds to their utility for various price levels. [¶] For example, if [a participant] received the same utility from the health risks of Marlboro Lights relative to Marlboro Reds from a 50 percent discount of the price of Marlboro Lights, Dr. Steckel would conclude these [participants] would be willing to pay 50 percent of the price of Marlboro Lights to obtain the lesser health risks of Marlboro Lights to Marlboro Reds. Dr. Steckel calculated a statistical average of all [participants] of these utilities to conclude that 40.8 percent of the money class members spent on light cigarettes was based on the reduced health risks of light cigarettes."

The court rejected the conjoint survey for a variety of reasons. The survey did not measure the difference between the price paid for Marlboro Lights and the actual value received, but rather measured "benefit of the bargain" damages not available in a UCL action; conjoint surveys have not been accepted in the relevant scientific community for litigation purposes; the method of selecting participants was flawed, and many participants were not class members; the fictional cigarettes excluded attributes that many class members testified were more important than the included attributes, and certain class members testified that in purchasing Marlboro Lights they did not even consider health risks; the survey instructions were difficult to understand, the questions were repetitive and complex, and sometimes participants gave different responses to the same

8

question; plaintiffs' economist expert, Robert Pindyck, Ph.D., conceded there was a substantial error in the methodology, which reduced the value of the supposed health benefits of Marlboro Lights from 40.8 percent to 22.8 percent; the survey was not based on "real world spending behavior involving giving up one's own money"; and the survey produced nonsensical results. On the latter point, the court noted that more than 28 percent of participants "showed a preference for health risks 'greater than Marlboro Reds and Marlboro Lights,' " the most dangerous option available and "more than 81 percent . . . show[ed] a preference of a higher price over a lower price."[5]

The court also denied injunctive relief on the ground of mootness, as "the evidence established that the descriptors on which the [p]laintiffs base their case have been removed and, because of changes in the law, these descriptors can never be used again." Further, the court determined "the public health community widely disseminated the information that lights are not healthier than regular cigarettes"; the Federal Cigarette Labeling and Advertising Act (15 U.S.C. § 1331 et seq.) preempts any mandatory labeling changes or disclosures on labels; and in *Tobacco Cases I,* plaintiffs waived any right to further injunctive relief or corrective advertising.[6] Additionally, the court denied

_____

[5] In a hearing on the statement of decision, the court noted: "Rarely have I ever seen something that was subject to such a multifaceted attack. It just demolished this survey. Then when you finally come right down to it, Dr. Steckel testified in another case just like this where he said there were no economic damages."

[6] In 1994, the Attorneys General of all 50 states sued six tobacco companies, including Philip Morris, for violating the UCL by marketing tobacco products to minors through cartoons and other means. In 1998, 46 states, including California, entered into a master settlement agreement, which required the defendants to pay the states a total of

9

plaintiffs' request for declaratory relief "as untimely and unsupported by any evidence supporting prospective relief."

Plaintiffs unsuccessfully moved for a new trial. Philip Morris moved for costs under Code of Civil Procedure section 1032, and plaintiffs moved to strike, or alternatively, to tax costs. The court determined Philip Morris was the prevailing party, and awarded it $764,552.73 in costs from class representative Watton. The court denied plaintiffs' request for discovery sanctions under Code of Civil Procedure section 2033.420.

DISCUSSION

I

*UCL Overview*

The UCL's "scope is broad. . . . [It] does not proscribe specific practices. Rather, . . . it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' (§ 17200.) Its coverage is 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' [Citation.] It governs 'anti-competitive business practices' as well as injuries to consumers, and has a major purpose 'the preservation of fair business competition.' [Citations.] By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the [UCL] makes

_____

$206 billion and consent to an injunction barring them from taking any direct or indirect action to target minors in their advertising. (*In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1262-1263; *Tobacco Cases I, supra,* 186 Cal.App.4th at p. 45)

10

independently actionable." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone* (1999) 20 Cal.4th 163, 180.)

"[A] practice may violate the UCL even if it is not prohibited by another statute. Unfair and fraudulent practices are alternate grounds for relief. [Citation.] False advertising is included in the 'fraudulent' category of prohibited practices." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370 (*Zhang*).) "To state a cause of action for violation of the UCL under the 'fraudulent' prong, the plaintiff must show that members of the public are likely to be deceived." (*In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1416.)

"To achieve its goal of deterring unfair business practices in an expeditious manner, the Legislature limited the scope of the remedies available under the UCL. 'A UCL action is equitable in nature; damages cannot be recovered.' " (*Tobacco II, supra,* 46 Cal.4th at p. 312.) "Injunctions are 'the primary form of relief available under the UCL to protect consumers from unfair business practices,' while restitution is a type of 'ancillary relief.' " (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337 (*Kwikset*).) Restitution is available "to restore to any person in interest any money or property . . . which may have been acquired by means of such unfair competition." (§ 17203.)

"[T]he equitable remedies of the UCL are subject to the broad discretion of the trial court. [Citation.] The UCL does not *require* 'restitutionary or injunctive relief when an unfair business practice has been shown. Rather, [section 17203] provides that the court "*may* make such orders or judgments . . . as may be necessary to prevent the use or

11

employment . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore . . . money or property." ' " (*Zhang, supra,* 57 Cal.4th at p. 371.)

Under an abuse of discretion standard of review, the "trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) A "court abuses its discretion ' "where no reasonable basis for the action is shown. [Citation.]" ' " (*Bui v. Nguyen* (2014) 230 Cal.App.4th 1357, 1367.)

II

*Measure of Restitution*

A

Plaintiffs do not challenge the sufficiency of the evidence to support the court's findings that they received value from Marlboro Lights apart from the deceptive advertising, and they did not submit competent evidence to establish the difference between the price they paid for Marlboro Lights and the actual value they received, the measure of restitution utilized in *Vioxx, supra,* 180 Cal.App.4th at page 131. Plaintiffs contend that as a matter of law, the court erred by determining *Vioxx* sets forth the *exclusive* measure of restitution for a UCL products case. They assert value is immaterial, and they were not required to prove any consumer losses attributable to the deceptive advertising, because as an alternative measure the court had discretion to order Philip Morris to make a full refund of their expenditures on Marlboro Lights, or its profits thereon, solely for the purpose of deterrence.

12

*Vioxx* affirmed the trial court's denial of class certification in a UCL action. (*Vioxx, supra,* 180 Cal.App.4th at p. 127.)  In *Vioxx,* the plaintiffs alleged a pharmaceutical company "misled consumers into paying more for Vioxx by misrepresenting it is safer than generic naproxen," and as restitution they "sought the difference between the price paid for Vioxx and the price which would have been paid for generic naproxen."  (*Id.* at p. 122.)

*Vioxx* explained:  "[Section 17203], providing restitution of funds which 'may have been acquired,' has been interpreted to allow recovery [for absent class members] without proof that the funds were lost as a result of actual reliance on defendant's deceptive conduct.  [Citations.]  While the 'may have been acquired' language of . . . section 17203 is so broad to allow restitution without individual proof of injury, it is not so broad as to allow recovery without any evidentiary support.  [Citation.]  *The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution.  [Citation.]  In order to recover under this measure, there must be evidence of the actual value of what the plaintiff received*.  When the plaintiff seeks to value the product received by means of the market price of another, comparable product, that measure cannot be awarded without evidence that the proposed comparator is actually a product of comparable value to what was received."  (*Vioxx, supra,* 180 Cal.App.4th at p. 131, italics added.)

*Vioxx* concluded that since the "evidence indicates that Vioxx was worth more than naproxen to *a majority of class members*, it is more than sufficient to support the trial court's conclusion that naproxen is not a valid comparator on a classwide basis."

13

(*Vioxx, supra,* 180 Cal.App.4th at p. 136.)  The issue of a valid comparator drug was a patient-specific issue, and thus restitution could not be calculated on a classwide basis. (*Ibid.*)

Vioxx cited *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163 (*Cortez*), in which the California Supreme Court held that orders for the payment of unpaid wages were a restitutionary remedy authorized by section 17203, over the defendant's objection they were damages unavailable in a UCL action.  (*Cortez,* at p. 178.)  *Cortez* explained:  " 'Damages,' as that term is used to describe monetary awards, may include a restitutionary element, but when the concepts overlap, the latter is easily identifiable.  Damages for fraud are an example.  In a fraud action the court may award as damages money fraudulently taken from the plaintiff.  Civil Code section 3343, subdivision (a), provides:  'One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction. . . .'  Thus, while the award of damages may be greater than the sum fraudulently acquired from the plaintiff, the award includes an element of restitution—*the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.  To that extent the award of damages literally includes restitution.*"  (*Id.* at p. 174, italics added.)

Plaintiffs point out that *Vioxx* stated the difference between the price paid and actual value received is *a* measure of restitution, not the exclusive measure.  (*Vioxx, supra,* 180 Cal.App.4th at p. 131.)  Plaintiffs cite *Johns v. Bayer Corp.* (S.D.Cal., Apr.

14

30, 2012, Civ. No. 09-cv-1935-AJB) 2012 WL 1520030, which observes that neither *Vioxx* nor *Cortez* "suggest[s] that the difference in price paid and value received is **the only** proper measure of restitution." (*Bayer,* at p. *5.)

We agree that *Vioxx* does not purport to set forth the exclusive measure of restitution *potentially* available in a UCL case. It remains, however, that plaintiffs had the burden of proving entitlement to an alternative measure of restitution proper under all the circumstances. The amount of restitution ordered under the UCL "must be supported by substantial evidence. Although a trial court has broad discretion under [the UCL] to grant equitable relief, that discretion is not 'unlimited' [citation], and does not extend beyond the . . . parties' evidentiary showing." (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 700 (*Colgan*).) "A court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1148 (*Korea Supply*).)

Plaintiffs submitted evidence that consumers spent $2.548 billion on Marlboro Lights during the class period, and Philip Morris received $1.333 billion of that amount after the deduction of franchise excise taxes. The figures were presented by plaintiffs' economics expert, Dr. Pindyck, but he did not suggest restitution in either of those amounts would be proper. Rather, he testified that based on the conjoint survey, the appropriate measure of restitution from an economics standpoint was $1.039 billion, which is 40.8 percent of the $2.548 billion in class expenditures, because that amount would "make the consumer whole." He explained the 40.8 percent "goes to the [health]

15

attribute that [consumers] thought they were getting."  Dr. Pindyck alternatively

calculated restitution of $544 million, based on 40.8 percent of Philip Morris's revenue of

$1.333 billion.

Further, during trial plaintiffs' counsel adopted the *Vioxx* measure of restitution.

During his questioning of Dr. Steckel, the following exchange took place:

> "Q:  And basically you understand that in California . . . under our restitution
> rules, we're only allowed to get the price paid minus the value that related to say
> the alleged deceit.  Do you understand that?
>
> "A.  I do understand that.
>
> "Q.  Okay.  So basically -- maybe I said that wrong.  It's price paid versus what the
> value that you actually received, right?
>
> "A.  Yes.
>
> "Q.  So the difference would be the . . . 40.8 percent?
>
> "A.  Yes."

In the portion of closing argument devoted to restitution, plaintiffs' counsel

focused exclusively on the conjoint survey.[7]  Counsel reminded the court that Dr.

Pindyck testified "restitution is the price the consumer paid minus what they actually

got."

In rebuttal, after Philip Morris's counsel pointed out the flaws in the survey,

plaintiffs' counsel stated:  "I think the [c]ourt has the authority, even without us doing a

conjoint survey here, to actually order the full amount of refund which is the billion three.

---

7       Likewise, in opening statement plaintiffs' counsel discussed restitution only in
terms of the conjoint survey.

So [in the conjoint survey] we're actually . . . requesting a lower amount than the [c]ourt has a fallback here. . . . [¶] So I think -- I don't know, but maybe it would have to go through the appellate courts, but I'm guessing the Supreme Court again. That's the fallback. It's the entire amount."

Plaintiffs' counsel, however, then backpedaled. The court asked him, "Is it all the money [Philip Morris] got, or just the money [it] got that's attributable to the health claims?" Counsel responded: "Well, I think . . . *it's the difference, Your Honor, yes. I think it's the difference between -- as to what [Philip Morris] got in the health claims, I do think that, yes.*" (Italics added.) The court then asked, "How do I know what the health claims are worth?" Plaintiffs' counsel returned to the conjoint survey, arguing it established the difference between the price paid and the actual value received.

Given this scenario, plaintiffs cannot reasonably fault the court for applying the *Vioxx* measure of restitution. As the court noted during a hearing on its statement of decision, "I think [plaintiffs' counsel] conceded that during the trial. Even some of [plaintiffs'] witnesses did." Plaintiffs are less than forthcoming when they assert they "continued to argue for a broader measure of restitution based upon sales and profits, right up through [posttrial] motions." "An appellant has the duty to summarize the facts fairly in light of the judgment, and such duty ' "grows with the complexity of the record." ' " (*Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596, 1607.)[8]

---

[8] Plaintiffs' attempt to blame their trial position on the measure of restitution on an indication the court made in a pretrial ruling is not well-taken. In a November 3, 2010, order the court rejected plaintiffs' request that it determine the measure of restitution

In any event, plaintiffs' full refund theory does not provide an alternative basis for restitution. Plaintiffs ignore well-settled law, including California Supreme Court authority, that restitution under the UCL may not be based solely on deterrence, no matter how egregious the defendant's conduct. Because plaintiffs obtained value from Marlboro Lights apart from the deceptive advertising, *Vioxx, supra,* 180 Cal.App.4th at page 131, sets forth the proper measure of restitution.

The UCL "serves the dual purposes of compensating *victims* and deterring perpetrators." (*Colgan, supra,* 135 Cal.App.4th at p. 699, italics added.) "The California Supreme Court has made clear that the dual purposes of restoration and deterrence served by these statutes [§§ 17203, 17535] are concurrent rather than independent . . . ." (*Id.* at p. 696, citing *Korea Supply, supra,* 29 Cal.4th at p. 1152.) " 'Restitution under . . . section 17203 is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." (Italics added.) A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other.' " (*Zhang, supra,* 57 Cal.4th at p. 371, citing *Kwikset, supra,*

---

applicable at trial. The court explained the request "is premature" and it "declines to exercise its discretion at this time and potentially bind itself to a remedy that may or may not be appropriate given the state of evidence at the time of trial." Trial did not begin until April 22, 2013, at which time plaintiffs were free to argue for any measure of restitution they deemed proper.

51 Cal.4th at p. 336.)  Generally, a party seeking restitution must return any benefit received.  (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 198.)

Section 17203 "operates only to return to a person those *measureable amounts* which are *wrongfully taken* by means of an unfair business practice.  *The intent of the section is to make whole*, *equitably, the victim of an unfair practice*.  While it may be that an order of restitution will also serve to deter future improper conduct, *in the absence of a measurable loss the section does not allow the imposition of a monetary sanction merely to achieve this deterrent effect*.  Nor is the section intended as a punitive provision, though it may fortuitously have that sting when properly applied to restore a victim to wholeness." (*Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 339, second italics added.)

In *Nelson v. Pearson Ford Co.* (2010) 186 Cal.App.4th 983, this court reversed a restitution order that was unrelated to the amount of consumer losses.  In *Nelson,* a car dealer added insurance premiums to the price of vehicles, which resulted in class members paying sales tax on the premiums.  The sales tax charged on the premium increased the cost of the class representative's car by about $30, but "the trial court awarded the members of the . . . class all the money they had paid for their vehicles as of the date of the judgment." (*Id.* at p. 1018.)  We held "[t]his is not appropriate restitutionary relief under the UCL as it does not accomplish the statutory objective of restoring to the victims sums acquired through Pearson Ford's unfair practices." (*Ibid.*, citing *Korea Supply, supra,* 29 Cal.4th at p. 1149.)

A full refund *may* be available in a UCL case when the plaintiffs prove the product had *no* value to them.  For instance, in *Ortega v. Natural Balance, Inc.* (C.D.Cal. 2014)

19

300 F.R.D. 422, 430, the court certified a class action where the plaintiffs sought a full refund for a dietary supplement on the ground it falsely advertised aphrodisiac qualities and had no value apart from that claim. In that type of case, it appears the *Vioxx* measure of restitution would still apply, since the price paid minus the value actually received equals the price paid. In that instance, a full refund is not based solely on the defendant's conduct, but on the dual considerations of the plaintiffs' losses and the defendant's conduct.

Several cases, relying on *Vioxx,* have indicated a full refund is *unavailable* under the UCL when the product had value to consumers notwithstanding the alleged deceptive advertising. For instance, *In re POM Wonderful LLC* (C.D.Cal., Mar. 25, 2014, No. ML 10-02199 DDP) 2014 WL 1225184, *3, states: "Plaintiffs do not cite, nor is the court aware of, any authority for the proposition that a plaintiff seeking restitution may retain some unexpected boon, yet obtain the windfall of a full refund and profit from a restitutionary award. Nor can [p]laintiffs plausibly contend that they did not receive any value at all from [d]efendant's [juice] products. Because the Full Refund model makes no attempt to account for benefits conferred upon [p]laintiffs, it cannot accurately measure classwide damages."[9]

---

9    See also, *Caldera v. J.M. Smucker Co.* (C.D.Cal., Apr. 15, 2014, No. CV 12-4936-GHK) 2014 WL 1477400, *4 ["sales data alone" was insufficient measure of restitution because the class representative's deposition testimony showed "class members undeniably received some benefit from the products"; restitution "based on a full refund would only be appropriate if not a single class member received any benefit from the products"]; *Ogden v. Bumble Bee Foods, LLC* (N.D.Cal., Jan. 2, 2014, No. 5:12-CV-01828-LHK) 2014 WL 27527, *13 ["Ogden concedes that she bought Bumble Bee's

In asserting a "trial court may award as restitution a full refund of the price paid, regardless of value received" (capitalization and bolding omitted), plaintiffs quote this broad language from *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442 (*Fletcher*): " 'To permit the [retention of even] a portion of the *illicit profits*, would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved.' " (*Id.* at p. 451, italics added.)

Plaintiffs incorrectly claim "*Fletcher* made it clear that trial courts are authorized to order restitution without proof of harm to the consumer." While *Fletcher* comments on the importance of deterrence, it does not suggest restitution may be awarded strictly for the purpose of deterrence. "[T]he language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097.) "The holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before

products for taste and convenience, as well as because of Bumble Bee's allegedly unlawful label statements, . . . which demonstrates that the products had *some* value to Ogden apart from the statements on the products' labels. Accordingly, Ogden must present additional evidence of the value of Bumble Bee's products without the allegedly unlawful label statements in order to obtain restitution."]; *Red v. Kraft Foods, Inc.* (C.D.Cal., Apr. 12, 2012, No. CV 10-1028-GW) 2012 WL 8019257, * 11 (*Red*) ["The Court . . . cannot approve [p]laintiffs' proposal that Kraft disgorge the full profits earned from sales of the Products within the class period, as [p]laintiffs undeniably received some benefit from the Products and thus awarding class members full refunds on their purchases would constitute nonrestitutionary disgorgement."].)

it or its holding or in its reasoning." (*McGee v. Superior Court* (1985) 176 Cal.App.3d 221, 226.)

In *Fletcher,* a bank calculated " 'per annum' " interest on consumer loans on the basis of a 360-day year, "resulting in a small increase in the annual percentage rate." (*Fletcher, supra,* 23 Cal.3d at p. 447.) The plaintiff commenced a purported class action, alleging the bank's practice was an unfair trade practice under section 17500, and he had no advance knowledge of the bank's practice. The action sought "restitution of the sums obtained through the use of this unfair business practice." (*Fletcher,* at p. 446.) The trial court granted the defendant's motion to dismiss the suit as a class action on the ground "the knowledge of each borrower . . . must be determined separately for each loan . . . ." (*Ibid.*) Our high court reversed, explaining the trial court's ruling was based on the erroneous ground that it lacked discretion to order restitution without individualized proof of lack of knowledge of absent class members. (*Id.* at pp. 449-450.)

While a full refund may have been available in *Fletcher,* the overcharging of interest did not confer any benefit on consumers. *Fletcher* confirms that "the trial court may order restitution to the plaintiff class in order to foreclose defendant's retention of any *wrongful* gains." (*Fletcher, supra,* 23 Cal.3d at p. 452, italics added.)

Plaintiffs also rely on *Tobacco II*, which cites *Fletcher* in support of its conclusion that the court erred in the instant action by decertifying the class on the ground Proposition 64 required each class member to show injury in fact and causation. (*Tobacco II, supra,* 46 Cal.4th at p. 320.) *Tobacco II* held that under the plain language of the amendments to the UCL (§§ 17203, 17204), and pursuant to voters' intent,

22

Proposition 64's *standing* requirements apply only to the class representative, and not to absent class members. (*Tobacco II,* at pp. 314-320.)

Tobacco II emphasized the language in section 17203 that parties are entitled to restitution " 'to restore to any person in interest any money or property, real or personal, which *may have been acquired*' (italics added) by means of the unfair practice . . . ." (*Tobacco II, supra,* 46 Cal.4th at p. 320.) The court concluded the language "is patently less stringent than the standing requirement for the class representative—'a person who has suffered injury in fact and has lost money or property *as a result of* the unfair competition.' (§ 17204, italics added.)" (*Ibid*.) The court explained that "[t]his language [section 17203], construed in light of the 'concern that wrongdoers not retain the benefits of their misconduct' [citation] has led courts repeatedly and consistently to hold that relief under the UCL is available without individualized proof of deception, reliance and injury." (*Ibid.*)

Tobacco II, however, does not suggest restitution is available absent *any* evidence of *any* loss to *any* class member. *Tobacco II* pertains to standing, and it acknowledges that "Proposition 64 did not amend the remedies provision of section 17203." (*Tobacco II, supra,* 46 Cal.4th at p. 319; *Kwikset, supra,* 51 Cal.4th at p. 337.) As this court has observed: "[T]he *Tobacco II* court did not state or suggest there are *no* substantive limits on absent class members seeking restitution when a defendant has engaged in an alleged unlawful or unfair business practice. Instead, the court recognized that under the UCL's statutory language, a person is entitled to restitution for money or property '*which may have been acquired*' by means of the unfair or unlawful practice. (Section 17203, italics

23

added; [citation].)  Although this standard focuses on the defendant's conduct and is substantially less stringent than a reliance or 'but for' causation test, it is not meaningless. To conclude otherwise would violate the statutory interpretation principle that every word in a statute must be given operative effect."  (*Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 924.)

Plaintiffs also cite this broad language from *Kwikset, supra,* 51 Cal.4th at page 328:  "Simply stated:  labels matter.  The marketing industry is based on the promise that labels matter—that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they come to associate with a particular source."

*Kwikset,* however, is another standing case.  It does not suggest restitution is available for the sole purpose of deterrence.  In *Kwikset,* the plaintiff filed a representative action under the UCL against the manufacturer of locksets labeled " 'Made in U.S.A.' " to "challenge the labels' veracity."  (*Kwikset, supra,* 51 Cal.4th at p. 316.) The trial court granted injunctive relief, but *denied restitution* because an award " 'would likely be very expensive to administer, and the balance of equities weighs heavily against such a program' where the violations had ceased and 'the misrepresentations, even to those for whom the "Made in USA" designation is an extremely important consideration, were not so deceptive or false as to warrant a return and/or refund program or other restitutionary relief to those who have been using their locksets without other complaint.' "  (*Id.* at p. 318.)

While an appeal was pending, Proposition 64 was passed "which called into question [the named plaintiff's] standing to challenge Kwikset's country of origin representations." (*Kwikset, supra,* 51 Cal.4th at p. 316.) The plaintiff filed an amended complaint to allege he purchased Kwikset locksets based on the " 'Made in U.S.A.' " labeling, but the Court of Appeal concluded the allegation was insufficient to establish standing. (*Ibid.*) Consistent with the trial court's denial of restitution, the amended complaint did not pray for such relief. (*Id.* at p. 319.) The Supreme Court accepted review to address standing requirements in the wake of Proposition 64. (*Kwikset,* at p. 317.)

*Kwikset* held that "plaintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise, have 'lost money or property' within the meaning of Proposition 64 and have standing to sue." (*Kwikset, supra,* 51 Cal.4th at p. 317.) *Kwikset* explained "the standards for establishing standing under section 17204 and eligibility for restitution under section 17203 are wholly distinct. . . . That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them." (*Id.* at pp. 335-336, citations omitted.)

Plaintiffs' reliance on *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508 is similarly misplaced. *Fremont* rejected the argument that "across-the-board restitution may not be ordered without proof that *all* consumers were deprived of money or property as a result of an unfair business practice." (*Id.* at p. 531, italics added.) *Fremont* merely recognized that individualized proof of harm is not required. It

does not indicate restitution may be ordered absent proof that *any* consumer was harmed. There must, of course, be some evidence of loss to raise an inference of classwide harm. (*Id.* at pp. 531-532.) *Fremont* acknowledged that the "trial court may order restitution of money 'which may have been acquired *by means*' *that are violative of the UCL.*" (*Id.* at p. 532, italics added; *Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 633 [class certification improper when "with respect to . . . a majority of class members, there is no doubt Pfizer did not obtain any money by means of the alleged UCL violation"].)

We also reject plaintiffs' assertion restitution may be ordered solely for the purpose of deterrence, because in a certified class action a court may order the "disgorgement" of profits into a fluid recovery fund.[10] The pertinent question is not whether a fluid recovery fund is available in a UCL class action, but whether the type of disgorgement at issue is available. (See *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 408.)

"There are two types of disgorgement:  restitutionary disgorgement, which *focuses on the plaintiff's loss*, and nonrestitionary disgorgement, which focuses on the defendant's unjust enrichment. [Citation.] 'Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position.' [Citation.]  However, '[m]any instances of "liability based on unjust

---

10     "Fluid recovery developed as a means by which to distribute the residue of a favorable class action judgment remaining after payment to those class members who have sufficient interest in obtaining recovery and can produce the documentation necessary to file individual claims." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 127-128.)

26

enrichment . . . do not involve the restoration of anything the claimant previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained . . . ." ' " (*Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 398, italics added.)

"The California Supreme Court has held that, while *restitutionary* disgorgement may be an available remedy under the UCL, *nonrestitutionary* disgorgement is *not* available in a UCL individual action or in a UCL *representative* action." (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 460 (*Madrid*), citing *Cortez, supra,* 23 Cal.4th at pp. 168-172; *Korea Supply, supra,* 29 Cal.4th at pp. 1145, 1152.) *Korea Supply* clarified that "[t]his court has never approved of nonrestitutionay disgorgement of profits as a remedy under the UCL," and "[w]hile prior cases discussing the UCL may have characterized some of the relief available as 'disgorgement,' we were referring to the restitutionary form of disgorgement, and not to the nonrestitutionary type sought here by plaintiff." (*Korea Supply,* at p. 1148.)

*Madrid* held that nonrestitutionary disgorgement is unavailable in a certified class action under the UCL, explaining: " '[T]he UCL is a substantive statute and the class action statute is a procedural device for collectively litigating substantial claims.' [Citation.] 'Fluid recovery in class actions . . . is merely a method of paying out damages after they have been awarded.' [Citation.] Thus, the use of the class action vehicle to litigate a UCL claim does not expand the substantive remedies available, and the availability of fluid recovery in a UCL class action (which we presume for purposes of this appeal) says nothing about the availability of *non*restitutionary disgorgement of profits." (*Madrid, supra,* 130 Cal.App.4th at p. 461; *Feitelberg v. Credit Suisse First*

27

*Boston, LLC* (2005) 134 Cal.App.4th 997 (*Feitelberg*) [court has no statutory or inherent authority to order nonrestitutionary disgorgement in certified class action under UCL].)

Plaintiffs submit that *Madrid* and *Feitelberg* are distinguishable because the plaintiffs there "never had any interest in the money they sought to recover." (*Madrid, supra,* 130 Cal.App.4th at p. 456; *Feitelberg, supra,* 134 Cal.App.4th at pp. 1005, 1016-1020.) Plaintiffs contend Philip Morris's disgorgement of all the money they spent on Marlboro Lights, or its profits thereon, would be restitutionary. They assert that the rule against nonrestitutionary disgorgement merely "prohibits a plaintiff from seeking return of money in which he *never* had an ownership interest." (Italics added.)

We disagree. "[C]ourts ordering restitution under the UCL 'are not concerned with restoring the violator to the status quo ante. The focus instead is on the victim.' " (*Madrid, supra,* 130 Cal.App.4th at p. 455.) Obviously, restitution without proof of any loss to any plaintiff cannot be characterized as *restitutionary*. (*Red, supra,* 2012 WL 8019257, *11 [when consumers received some benefit from products, disgorgement of full profits "would constitute nonrestitutionary disgorgement"]).)

Plaintiffs' reliance on this court's opinion in *Juarez v. Arcadia Financial, Ltd.* (2007) 152 Cal.App.4th 889 (*Juarez*) is also misplaced. *Juarez* was a class action that alleged the defendant violated the UCL by violating the Rees-Levering Automobile Sales Finance Act. (*Jurarez,* at p. 894.) We reversed a summary judgment for the defendant, concluding it did not give sufficient notice to defaulting buyers of their rights to reinstate their contracts. (*Id.* at pp. 901, 912.)

28

We also held the court abused its discretion by denying the plaintiffs' motion to compel the defendant "to provide information about any profits it made from use of the money it received from plaintiffs for 'invalid deficiency claims.' " (*Juarez, supra,* 152 Cal.App.4th at p. 912.) *Juarez* clarified: "We do not intend to suggest that the plaintiff class ultimately will be able to establish the existence of a vested interest in any profits Arcadia may have received as a result of collecting money pursuant to an unlawful business practice. Rather, we merely recognize that in the context of this discovery dispute, it is not clear that the plaintiffs will *not* be able to establish that the disgorgement of certain profits made as a result of its unlawful practice falls under the rubric of '*restitutionary* disgorgement.' " (*Id.* at p. 917, fn. 16, second italics added.) Plaintiffs seize on broad language in *Juarez*, such as "the concept of restitution is broader than simply the return of money that was once in the possession of the person from whom it was taken," and " '[o]rdinarily, the measure of restitution is the amount of unjust enrichment received' " (*id.* at p. 915), but it is unhelpful when considered in context.

3

We conclude that as a matter of law, restitution is not available here for the exclusive purpose of deterrence. Under plaintiffs' theory, a full refund would be available on any product, even costly items such as cars, yachts, and planes, based on UCL violations that had little or no impact on value. That, of course, is not the law. "Section 17203 makes injunctive relief 'the primary form of relief available under the UCL,' while restitution is merely 'ancillary.' " (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 790.) Without any showing of loss to plaintiffs, there can be no restoration

29

of money "which may have been acquired *by means of such unfair competition*."

(§ 17203, italics added.)[11]

While a full refund may be proper when a product confers *no* benefit on consumers, such is not the scenario here. Plaintiffs do not dispute the court's finding that they obtained value from Marlboro Lights apart from the deceptive advertising. Indeed, it appears inherently implausible to show a class of smokers received *no* value from a particular type of cigarette. Under the circumstances, the *Vioxx, supra,* 180 Cal.App.4th at page 131, measure of restitution was proper, and as plaintiffs did not establish any price/value differential the court lacked discretion to award restitution.[12]

III

*Injunctive Relief*

Additionally, plaintiffs contend the court abused its discretion by denying their request for injunctive relief. "A trial court has broad authority to enjoin conduct that violates section 17200. [Citation.] That authority is expansive but not unlimited. Although the [UCL] imposes liability for past acts, in order to grant injunctive relief

---

11    Plaintiffs' reliance on the maxim "[f]or every wrong there is a remedy" (Civ. Code, § 3523) is also misplaced. "[T]his statute does not create substantive rights or an unbounded right to damages." (*The MEGA Life & Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1526.) The UCL does provide remedies, but plaintiffs did not prove entitlement to relief.

12    Plaintiffs claim remand is required because the court's statement of decision indicates it erroneously believed *Vioxx* sets forth the only measure of restitution available in a UCL action. Given our holding, however, any arguable misunderstanding was immaterial and a remand would serve no purpose other than delay. (*In re Vincent S.* (2001) 92 Cal.App.4th 1090, 1093 ["[R]emand for another hearing would constitute an idle act; and the law does not require idle acts."]; Civ. Code, § 3532.)

under section 17204 or section 17535, there must be a threat that the wrongful conduct will continue. 'Injunctive relief will be denied if, at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct.' " (*Colgan, supra,* 135 Cal.App.4th at p. 702.) " 'The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.' " (*Contra Costa County v. Pinole Point Properties, LLC* (2015) 235 Cal.App.4th 914, 925.)

In *Philip Morris I,* Judge Kessler permanently enjoined Philip Morris and other tobacco companies from "conveying any express or implied health message or health descriptor for any cigarette brand either in the brand name or on any packaging, advertising or other promotional, informational or other material." (*Philip Morris I*, *supra,* 449 F.Supp.2d at p. 4.) Judge Kessler specified that "[f]orbidden health descriptors include the words 'low tar,' 'light,' 'ultra light,' 'mild,' 'natural,' and any other words which reasonably could be expected to result in a consumer believing that smoking the cigarette brand using that descriptor may result in a lower risk of disease or be less hazardous to health than smoking other brands of cigarettes." (*Ibid.*) Congress has essentially codified the injunction in title 21 United States Code section 387k(b)(2)(A)(i) and (ii), effective June 22, 2009. When federal law compels a defendant in a state court action "to stop the offending conduct," there is no entitlement to injunctive relief. (*Feitelberg, supra,* 134 Cal.App.4th at p. 1022.)

31

Plaintiffs contend the offending conduct "continues to this day," since Philip Morris still sells the same cigarettes, now named Marlboro Gold, in "lightly colored packaging," which ostensibly misleads consumers into believing they are less dangerous than Marlboro Reds or other cigarettes in dark-colored packs.

The operative complaint, however, does not allege any pack color issue as a violation of the UCL. Further, the court made no such finding, and plaintiffs assign no error in that regard. We cannot say the court exceeded the bounds of reason by not enjoining a practice it did not find deceptive.

Further, plaintiffs do not fairly portray the evidence on the matter. Plaintiffs cite the opinion of their expert on "[consumer] perceptions," Michael Cummings, Ph.D., that "consumers, based on the research we've done, still perceive just by the colors alone the product's being lower tar and nicotine." He relied on a 2009 survey of shoppers at a mall in Buffalo, New York, and a 2008 Internet survey. He conceded, however, that beginning in 2011 "and continuing to today," all Marlboro Gold packs contain a "tear tape" that warns, "Nothing about this cigarette packaging *or color* should be interpreted to mean safer." (Italics added.) He also conceded he had no evidence on consumer perceptions pertaining to pack color *after* the tear tapes were included. The court could reasonably find that after 2011, any lingering perception pertaining to pack color is a moot point.[13]

---

[13]    Given our holding, we are not required to discuss Philip Morris's assertion the 2008 and 2009 surveys "had serious methodological flaws." We are also not required to address the court's alternative grounds for denying injunctive relief.

IV

*Declaratory Relief*

Plaintiffs also contend the court abused its discretion by not granting them declaratory relief. " ' " 'The fundamental basis of declaratory relief is the existence of an actual, present controversy over a proper subject.' " ' " (*Linda Vista Village San Diego Homeowners Assn., Inc. v. Tecolote Investors, LLC* (2015) 234 Cal.App.4th 166, 181; Code Civ. Proc., § 1060.) Whether a claim presents an actual, present controversy for purposes of declaratory relief " ' "is a question of law that we review de novo." [Citation.] When an actual controversy does exist, Code of Civil Procedure section 1061 gives the trial court discretion to determine whether it is "necessary" and "proper" to exercise the power to provide declaratory relief.' " (*Coronado Cays Homeowners Assn. v. City of Coronado* (2011) 193 Cal.App.4th 602, 607.)

The court determined plaintiffs' request for declaratory relief was untimely. The operative complaint prayed for restitution and injunctive relief, but not declaratory relief. Plaintiffs point out that a "complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the parties" (*Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943, 947), but the issue here does not pertain to the adequacy of the pleading. Plaintiffs do not dispute Philip Morris's representation that they did not request declaratory relief during trial and first raised the issue in their written objections to the court's statement of decision. "Because the argument was not litigated at trial, . . . the trial court was under no obligation to address it." (*Colony Ins. Co. v. Crusader Ins. Co.* (2010) 188 Cal.App.4th

33

743, 751.) The court had no sua sponte duty to raise declaratory relief on plaintiffs' behalf.

At any rate, even without waiver plaintiffs would not prevail. As the court alternatively determined, their request for declaratory relief was "unsupported by any evidence supporting *prospective* relief." (Italics added.) "Declaratory relief operates prospectively, serving to set controversies at rest *before* obligations are repudiated, rights are invaded or *wrongs are committed.* Thus the remedy is to be used to advance preventive justice, to declare rather than execute rights. [Citation.] Declaratory relief serves a practical purpose in stabilizing an uncertain or disputed legal relation, thereby defusing doubts which might otherwise lead to subsequent litigation." (*Kirkwood v. California State Automobile Assn. Inter-Ins. Bureau* (2011) 193 Cal.App.4th 49, 59, italics added.) "[D]eclaratory relief ' "operates prospectively, and not merely for the redress of past wrongs." ' " (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1403.)

Plaintiffs sought a judicial declaration that Philip Morris's "conduct and advertising pertaining to Marlboro Lights, because of the 'Lights' and 'Lowered Tar and Nicotine' descriptors, was false, misleading, deceptive and violative of the UCL." The use of those descriptors was a completed wrong, and there is no likelihood of future violations. The parties need no judicial guidance to conform their conduct to the law or avoid future litigation.

Further, Philip Morris's denial at trial that it engaged in deceptive advertising does not create an actual, present controversy for purposes of declaratory relief. "The

34

requirement that plaintiffs seeking declaratory relief allege 'the existence of an *actual, present controversy*' [citation] would be illusory if a plaintiff could meet it simply by pointing to the very lawsuit in which he or she seeks that relief. Obviously, the requirement cannot be met in such a bootstrapping manner; 'a request for declaratory relief will not create a cause of action that otherwise does not exist.' " (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 80.) As a matter of law, the court's ruling is correct.

V

*Costs*

Additionally, plaintiffs challenge the court's award of $764,552.73 in costs to Philip Morris from class representative Watton. Plaintiffs do not dispute the amount, but contend Philip Morris was not the prevailing party.

"Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) " 'Prevailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered*, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant*. When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ." (*Id.*, subd. (a)(4), italics added.) Philip Morris unquestionably comes within the italicized language.

35

In plaintiffs' view, however, this is a " 'situation other than as specified' " within the meaning of Code of Civil Procedure section 1032, subdivision (a)(4), because the court determined Philip Morris was guilty of deceptive advertising under the UCL. They cite *Pirkig v. Dennis* (1989) 215 Cal.App.3d 1560, 1566 (*Pirkig*), disapproved of on another point in *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1330, for the proposition that "[p]revailing on the issue of liability may be deemed sufficient in itself to determine a prevailing party under the broad definition of [Code of Civil Procedure] section 1032."

When construing a statute, we look first to its words, " 'because they generally provide the most reliable indicator of legislative intent.' " (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529.) " 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' " (*Id.* at p. 530.)

The "situations other than as specified" language of Code of Civil Procedure section 1032, subdivision (a)(4) obviously applies when there is no prevailing party under *specified* situations. "Generally, when a party falls squarely within one of the four situations enumerated in the definition of a prevailing party under [Code of Civil Procedure] section 1032, that party is entitled to recover costs as a matter of right." (*Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175, 188.) Philip Morris falls squarely within two of the situations enumerated in the statute, and thus it is entitled to costs as a matter of right. (*Ibid.*; *Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1198.)

The prevailing party in *Pirkig* did not fall within one of the four situations enumerated in Code of Civil Procedure section 1032, subdivision (a)(4). The issue there

36

was whether the trial court had discretion to award costs to a plaintiff who did not obtain a net monetary recovery. (*Pirkig, supra,* 215 Cal.App.3d at p. 1566.)

Plaintiffs also cite *Hsu v. Abbara* (1995) 9 Cal.4th 863, 877 for the notion that "*in determining litigation success*, courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.' " *Hsu*, however, concerned Civil Code section 1717, which applies to contractual attorney fees. (*Hsu,* at p. 877.) Further, *Hsu* acknowledged that "when one party obtains a 'simple, unqualified win' on the single contract claim presented by the action, the trial court may not invoke equitable considerations unrelated to litigation success . . . ." (*Ibid.*)

Additionally, plaintiffs provide this quote from *Miller v. American Honda Motor Co.* (1986) 184 Cal.App.3d 1014: "An award of costs in an equitable action is beyond the pale of subdivisions (a) and (b) of [Code of Civil Procedure] section 1032." (*Id.* at p. 1019.) Plaintiffs ignore that *Miller* refers to a former version of Code of Civil Procedure section 1032, under which "[c]osts in equitable actions [were] instead governed by the discretionary provisions of subdivision (c)." (*Miller,* at pp. 1019-1020.)

VI

*Discovery Sanctions*

Lastly, plaintiffs contend the court abused its discretion by denying their motion for expenses in establishing matters Philip Morris failed to admit in responding to requests for admissions. "If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that

37

matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (Code Civ. Proc., § 2033.420, subd. (a).)[14]

The court denied discovery sanctions on the ground plaintiffs "failed to provide any specific accounting of costs or fees incurred" as a result of Philip Morris's failure to make admissions. Instead, plaintiffs requested "sanctions equal to the amount of costs that it contends [Philip Morris] may be entitled to." The court cited *Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 737, which reversed a sanctions award for the failure to make admissions when counsel "failed to set out either his hourly fee or any accounting of time spent on the case." The court also noted plaintiffs "will have a difficult time parsing out what evidence presented at trial could only be attributed to the [requests for admissions] at issue in this motion since the subject issues are inextricably intertwined with other significant issues in the case."

Plaintiffs ignore their failure to provide an accounting. They make no effort to show any compliance with Code of Civil Procedure section 2033.420. Thus, they have waived appellate review of the matter. "In civil appeals, the appellate courts are *not* required to perform an unassisted study of the record or review of the law relevant to a

---

14    Subdivision (b) of Code of Civil Procedure section 2033.420 provides: "The court shall make this order unless it finds any of the following: [¶] (1) An objection to the request was sustained or a response to it was waived under Section 2033.290. [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit."

party's contentions on appeal. [Citations.] Instead, a party's failure to perform its duty to provide argument, citations to the record, and legal authority in support of a contention may be treated as a waiver of the issue." (*Bank of New York Mellon v. Preciado* (2013) 224 Cal.App.4th Supp. 1, 6; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

## VII

### *Philip Morris's Appeal*

Phillip Morris has filed a protective cross-appeal on issues of class certification. It agrees that if we affirm the judgment, its appeal should be dismissed as moot.

### DISPOSITION

The judgment is affirmed. Philip Morris's cross-appeal is dismissed. Philip Morris is entitled to costs on appeal.

McCONNELL, P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.

39